**TECHNOGRAPH PRINTED CIR-
CUITS, LTD.,**
and
Technograph Printed Electronics,
Incorporated

v.

**BENDIX AVIATION CORPORATION.**

Civ. A. No. 11421.

United States District Court
D. Maryland.

May 27, 1963.

**2**

John W. Avirett, 2d., Baltimore, Md., Walter J. Blenko and Walter J. Blenko, Jr., Pittsburgh, Pa., and M. Victor Leventritt, New York City, Piper & Marbury, Baltimore, Md., Blenko, Hoopes, Leonard & Buell, Pittsburgh, Pa., of counsel, for plaintiffs.

Benjamin C. Howard, Miles & Stockbridge, Baltimore, Md., Edward S. Irons, Edward F. McKie, Jr., and Harold J. Birch, Washington, D. C., and Irons, Birch, Swindler & McKie, Washington, D. C., of counsel, for defendants.

R. DORSEY WATKINS, District Judge.

This is an action for alleged infringement of three patents, all relating to the "Manufacture of Electric Circuit Components." The plaintiff Technograph Printed Circuits, Ltd., is a British corporation which by mesne assignments from the inventor, Paul Eisler, is the owner of the patents in suit. The plaintiff Technograph Printed Electronics, Inc., a North Carolina corporation, is the exclusive licensee under said patents, with right to license others. Ordinarily the two companies will be referred to as plaintiffs.

The defendant, The Bendix Corporation (formerly Bendix Aviation Corporation), is a Delaware corporation with an established place of business within the District of Maryland, and is alleged to have committed acts of infringement within this District.

Jurisdiction was adequately proved, and is admitted.

### Narrative Background.

The inventor, Dr. Paul Eisler, was an Austrian subject. His earlier education was in the electrical field. His first professional activity was for a British firm working on radio equipment installed in Yugoslavian trains. Later he worked for an Austrian manufacturer of radio and other electrical communication equipment; founded and edited a paper for amateur builders of wireless sets; and set up a small laboratory for the construction of amateur wireless equipment. All this work was on the "point-to-point" wiring system, the prefabricated "components" being mounted on a supporting frame or chasis and connected by individual wires soldered, clipped or otherwise attached from point to point.

In 1936 Eisler, then twenty-nine years old, came to England to work on certain aspects of television, intending ultimately to return to Austria. The Nazi rise prevented this, and Eisler secured employment with a chain of cinema theatres, working on sound and picture projections. In 1940 he was interned but was released in 1941. His alien status made employment a problem. He claims that after Churchill's appeal for individual effort in winning the War, he decided

that his greatest help could be in the field of the production of electronic equipment. He revived his interest in "printed" circuits, upon which he had first worked in 1936, at which time he had painted circuit lines with adhesive paint, and stuck gold leaf thereon.

Eisler ultimately interested the managing director of an old London firm of printing engravers, whose plant had been bombed out. Music printing was not an essential war production, and new equipment could not be obtained for that purpose. With what was available, Eisler began his experiments, at first alone, but later in 1943, with another Austrian whom Eisler had helped to escape.

Many methods were tried, using existing printing equipment and skills—including "printing" with an ink which would become conductive on drying; spraying powder and molten metal onto an adhesive ink;[1] chemical deposition with blocking out by a negative and electroplating; punching out a pattern from metal foil[2]; the use of fusible metal and "detinning"; and the use of prefabricated "foil"[3], adhered[4] to an insulating medium. Rolled copper, aluminum, steel and copper-nickel foils were available, but hard to obtain. The cost of rolling foil in the desired width was prohibitive, and later Eisler manufactured his own foil by the electrolytic process developed by Thomas Alva Edison. Rolled or electrolytic foil was then bonded to insulated paper or a laminate (bakelite). The bonding qualities of electrolytic foil were and are superior to those of rolled foil.

Eisler made a three "valve" (tube) printed circuit radio receiving set using

1. Eisler considered this method capable of producing a product that functioned electrically, but which was not suitable for mass production.

2. Tooling presented a difficult problem.

3. The meaning of "foil" is an important one, and will be the subject of further substantial consideration. In his deposition Eisler defined it as a

"* * * thin layer material which is prefabricated and contains all the qualities which you want from the electrical elements of the circuit before the printer

lays his hands on it, a foil." (page 165.)

"* * * but the main thing is you have to get as your raw material, prefabricated already and testable by the man before he makes a pattern that it contains all the qualities required, conductivity, thickness, homogeneity, all the things a foil laminated to an insulating support which you use instead of the paper for the printing." (page 166.)

4. Securing adhesion was said by Eisler to be an art in itself.

a well-known circuit. The testimony is to the effect that the set worked, and was used to receive broadcasts of the Allied invasion on D-Day. It was introduced in the trial of this case as an exhibit, but was not in working condition, and apparently no effort was made to make it workable during the extended trial.

Prior to D-Day efforts were made to have the alleged printed circuit methods adapted to war production. Despite the alleged existence of the Eisler radio, and of demonstration "books" of sheets of copper clad laminate processed through successive stages of manufacture (none of said books having been located or offered in evidence), the British Government was completely non-receptive.

After VE-Day, efforts were made to interest commercial manufacturers. None of the radio manufacturers could be persuaded to change its methods of production. With the exception of strain gauges "dealt with in quantities of tens or hundreds of thousands"[5] no commercial production was secured in England prior to about 1955.

The printed circuitry, allegedly invented by Eisler, with which the case is principally concerned, essentially consists of a "printing"[6] step by which a circuit network is delineated on the face of a preformed insulating sheet. The unwanted metal is preferably dissolved in an etchant, after which external components may be joined by insertion, manual or machine, and soldering may be effected manually, or in certain instances by dipping or flow soldering.

### Eisler British Patents.

On February 2, 1943, Eisler filed his first provisional specification (1749/43). An additional provisional specification was filed on April 3, 1943. A complete British specification was filed on Febru-ary 2, 1944, and a corresponding United States application, Serial No. 520,991, was filed February 3, 1944. Eisler's British Patent Agent (O'Dell) testified that the original British complete specification is identical with the specification of United States application Serial No. 520,981.[7] The history of the English prosecutions is unusually significant in its bearing upon the validity and scope of the American patents.

The Eisler British applications were filed without any search of the prior art having been made. Eisler and his British Patent Agent were under the impression that Eisler was the inventor of the printing of electric circuits by any method (O'Dell deposition, page 63); that Eisler could "probably more or less monopolize printed circuits; not only the foil technique, but a lot of processes could be used for some particular limited usage." (Eisler deposition, page 225). The printing and etching technique was only one of the many techniques disclosed as equivalents.

In the first Office Action, of July 13, 1944, in United States Application Serial No. 520,991, the Examiner cited art disclosing manufacture of electrical circuits by some of the methods of the printing art disclosed and broadly claimed by Eisler.[8]

In November 1946 the British Examiner cited a number of pertinent references against the British complete specification. These will later be discussed. As a result, it could no longer be said "that the idea of printing electric circuits was new," and "the application fell into bits" (O'Dell, page 63); "fell apart" (O'Dell, page 81). Accordingly the complete specification (British 639,111) was amended in disclosures; certain prior art was acknowledged and expressly disclaimed; and the application was limited

---

5. Eisler's deposition, page 293.

6. The meaning of "printing" also is significant on questions of validity, and will be separately treated.

7. A copy of the original British specification is contained in the certified file his-tory of abandoned Eisler application Serial No. 11,795 (DX 531).

8. With one possible exception, however, the cited art did not teach the use of a *printing* and *etching* technique to produce electric circuitry.

in claims to flexible printed circuitry produced by the etching technique. As so limited it issued ("Complete Specification Published") June 21, 1950.

A divisional application was simultaneously issued as British Patent 639,-178, limited in disclosure and claims to the production of printed circuits in which ink was applied as the resist material. Reference to formation of the resist pattern by photographic means was omitted as not required to support the limited claims. Certain prior art was again expressly acknowledged and disclaimed.

A second divisional application also simultaneously issued as British Patent 639,179, limited in disclosure and claims to a method in which ink containing a readily fusible metal pigment was applied to insulation, and the metal subsequently consolidated by heat.

In connection with the prosecution and allowance of the United States patents, it is noteworthy that (a) the specifications (disclosures) were not changed (except as noted); (b) no acknowledgment of prior art, disclaimed in the British patents, was made; and (c) with one exception, and that late in the prosecution of the second ('568) patent, none of the art disclaimed in Eisler's British patents was cited. The significance of this is emphasized by the fact that British Examiners search only for anticipation and double claiming, questions of obviousness in view of the teaching of the prior art being left to the courts.

### The United States Patents.

The first Eisler application for a United States Patent, Serial No. 520,991, was filed Feburary 3, 1944. Patent No. 2,441,960 (hereafter '960) issued on May 25, 1948 and is in suit. On February 27, 1948, a divisional application 11,798 was filed, out of which Patent No. 2,257,-568 issued on February 26, 1952, and was subsequently reissued on June 12, 1956 as United States Reissue 24,165 ('165) in suit. Divisional Application 11,798

was further divided by Application 261,-989, filed December 17, 1951, and issued on April 15, 1955 as Patent No. 2,706,697 ('697) in suit.

Patents '960 and '697 were each granted for the normal statutory term of seventeen years; 35 U.S.C. § 154. Patent '568, however, was granted for a shorter term in accordance with the provisions of the Boykin Act, Public Law 690, August 8, 1946. Accordingly, '165 expired February 2, 1963.[9]

### Claims in Suit—Defenses.

The patents in suit, the claims declared on by plaintiffs, and the "example" claim or claims are:

Patent '960: No. 2,441,960 dated May 25, 1948: claims 1 and 2; example claim, 1.

Patent '165: No. Re. 24,165 dated June 12, 1956 (Original No. 2,587,568 dated February 26, 1952); claims 1, 2, 6 and 7; example claims, 1 and 7.

Patent '697: No. 2,706,697 dated April 19, 1955; claims 4, 5, 10, 14, 15 and 16; example claims, 4, 5 and 10.

(For convenience and eye-relief the pertinent portions of the specification of '960, and the declared on and example claims are filed as an Appendix, which includes also the declared on and example claims of '165 and '697, with a reference to the manner in which their specifications differ from those of '960).

*Defendant in its answer:*

1. Denies infringement.

2. Alleges invalidity of all three patents, and all of their claims, and specifically, that:

 a. '165 is void for double patenting over '960;

 b. '697 defines nothing patentably distinct over '568 (of which '165 is a reissue), and over '960.

 c. '697 is void for laches in claiming the subject matter of the claims,

9. The original Eisler application had been filed in Great Britain on February 2, 1943. Application No. 520,991 was filed in the United States on February 3, 1944.

particularly in view of intervening public use.

d. '697, and especially claim 5 thereof, fails to define an operative process. (35 U.S.C. § 112).

e. All three patents are void in view of obviousness, in the light of the prior art, to a person having ordinary skill in the art.

3. Alleges that all three patents are unenforceable for the reason that the claims were prosecuted and allowed to issue "without bringing to the attention of the United States Patent Office prior art, negating invention in said claims, which was then known to" plaintiffs, their predecessors and privies.

4. Alleges that all three patents are unenforceable due to misuse.

5. Alleges that the three patents are invalid because Paul Eisler was not the original and first inventor of the subject matter patented.

6. Seeks a decree that the three patents "are invalid and void as to all claims thereof * * *."

Late in the case defendant made clear its intention to defend also on the ground of anticipation, 35 U.S.C. § 102. The answer was not amended, but the case was tried, argued and briefed on this and the other defenses.

### Contentions as to Scope of Claims.

Plaintiffs and defendant are in agreement that the claims in suit are all method claims, but are substantially in disagreement in all other respects.

### Plaintiffs' Position.

Plaintiffs contend that:

None of the claims "reads" on a standard photo-engraving technique. None of the claims calls merely for the etching of foil. "The use of an etched foil technique is, however, an essential and vitalizing *part* of the Eisler inventions. * * *" [10] "Nor are the claims ad-

dressed to processing details such as the composition of the resist or the kind and strength of the etchant to be employed." [11]

Patent '165. "The underlying concept of Patent '165 is of a new and better way of making circuit *assemblages* * * *" [12] It is claimed that various alleged infringing devices of defendant "are built according to the teachings of Patent '165, commencing with the making of a circuit network by printing and etching a piece of insulation-backed foil, with provision made for the joining-in of external components at pre-arranged junction points, the insertion of the component leads at the junction points, and the making of metallic joints between the leads and the circuit network." [13]

Patent '960. Where it is unfeasible or uneconomical "to create the entire etched-foil circuit network on one side only of an insulating panel" because some of the tracks would cross others and thus cause short circuits, the '960 patent "enables the circuit manufacturer to create different parts of the etched foil circuit complex in parallel planes, insulated generally from one another by the insulating backing and hence permitting of 'crossing' conductors, and with electrical connections through the backing for electrically joining conductors in different planes where desired." [14]

Patent '697. "Two inventions—the negative imprint process and the transfer process—are covered by Patent '697." "By the use of the negative imprint process the most complex circuit networks, consisting of etched foil with an overlying coating of a dissimilar metal, can be made. * * * It is achieved in the '697 process by making a negative imprint of the desired circuit pattern with a plating resist on a sheet of insulation-backed foil, electroplating the exposed foil areas with the desired dissimilar metal, removing the plating resist, and then etching away the new-exposed foil

10. Plaintiffs' Brief on Infringement, page 6; original emphasis.

11. Ibid., page 7.

12. Ibid., page 8; original emphasis.

13. Ibid., page 9.

14. Ibid., page 12.

with an etchant which attacks the foil but does not attack the plated metal. In this method the foil, which remains a continuous and unitary sheet of metal *throughout the plating operation,* serves as a common cathode for all the metallic areas which are ultimately to be electrically separate in the completed network." [15]

In the transfer process, a "negative imprint is made on a piece of copper foil and silver is electrodeposited on the copper which remains exposed; the resist is removed, the foil is laid upon a sheet of partially cured plastic with the silver pattern at the interface; the assemblage is subjected to heat and pressure, resulting in the silver pattern becoming embedded in the plastic and the plastic being cured; the foil is then etched away, leaving the silver pattern exposed and flush with the surface of the plastic in which it is embedded." [16]

### Defendant's Position.

Defendant's position is stated as follows: [17]

"Significantly, the claims of the '960 patent and Reissue 24,165 rely upon precisely the same disclosure. Although issuing subsequent to the '960 patent, the claims of the '568 patent and U. S. Reissue 24,165 are directed broadly to a method for production of 'printed circuits' by well known techniques *admittedly borrowed* from the graphic arts. Stripped of apparatus limitations inserted in a demonstrably futile effort to distinguish over prior use of these same techniques for the same purposes in the electrical art, the claims of the Reissue patent recite the following simple process steps:

"(1) 'printing' a representation of the desired conductive patterns in an acid resistant medium on the metal surface of a suitably metallized insulating material;

"(2) etching away the metal not covered by the resist pattern, and

"(3) making electrical connections to the conductive pattern thus produced.

"The claims of the earlier issued '960 patent cover *no more* than a process wherein two circuit parts produced in accordance with the claims of the Reissue Patent 24,165 are superimposed back to back and electrical connections are made between the two parts through the interposed insulation.

"The third patent in suit, Eisler 2,706,-697, is directed to two somewhat nebulously disclosed processes also acknowledged as old in the graphic arts, *viz:*

### "*The Metallic Resist Process.*

"(1) A negative representation of the desired conductive pattern initially is formed in resist on the metallic surface of a metallized insulator followed by deposition of dissimilar metal on the portions not covered by the resist. The original resist is then removed and the thus uncovered orginal metal is etched away to leave the desired conductive pattern.

### "*The Transfer Process.*

"(2) The desired conductive pattern initially is produced on a temporary support, conductive or non-conductive, and then in a wholly undisclosed fashion, is transferred 'in accordance with the methods of the printing art' to a permanent support which may be glass."

### United States Patent Office Procedure.

By way of summary, it may be stated that the original claims of all three patents in suit were initially unhesitatingly rejected on the prior art. By the "ant-like processes" [18] of plaintiffs' solic-

---

15. Ibid., page 15; original emphasis.

16. Ibid, page 16.

17. Defendant's Brief on Validity Issues, pages 1–3; original emphasis.

18. "Of at least equal persuasiveness are the tortuous progress of these patents through the Patent Office from 1935 to 1942 and the many emendations of statement, especially in the second patent, made to meet the objections of examiners—a classic example of what Judge Learned Hand has called 'the ant-like persistency of solicitors' which overcomes

itors,[19] and after conferences of Eisler and his then attorneys with the Examiner, the nature of which were not indicated in the respective File Wrappers, as is customarily the case, the claims in suit were ultimately allowed. It is, unfortunately, necessary to consider, almost ad nauseam, the history of the patents in the Patent Office. This is true for a number of reasons: (a) a consideration of the cited prior art; (b) the significance of the distinctions urged, and apparently accepted, by plaintiffs in attempting to distinguish the prior art; (c) the omission of citation of prior art; and (d) the emphasis, in the Patent Office, upon the meanings of "printing" and "foil." [20]

If this and the following detailed consideration of the prior art may appear to be labored, the court suggests that the complexity of procedures before the Patent Office, and in the trial of the case, permit of no short cuts.[21]

'960. The application (based on the British application filed February 2, 1943) shows that Eisler represented himself as a pioneer inventor in the printed circuit field. The specification and the

original claims indicate that the emphasis was upon the making of proper drawings, the preparation of printing plates from the drawings, and the production of metallic patterns corresponding to the patterns of the printing plates. Also emphasized was the production of at least two drawings and two printing plates, each containing only a portion of the circuits and circuit connections; and after completion of the two or more metallic patterns, the superimposing of the patterns back to back, and the interconnection of the patterns through an insulating base [22] to make crossing connections.

The actual steps of proceeding from the printing plates to the final metal patterns were not specifically indicated; any of those well known to the printing art being indicated, apparently as equivalents. Likewise, the etching may be done in the well known manner of the printing art.

The essence of the patent is stated to be: [23]

"It will be seen that the essence of the particular method of producing circuit components just described is

'the patience of examiners, and there is apparently always but one outcome.' See Lyon v. Boh, D.C.S.D.N.Y., 1 F.2d 48, 50, reversed on grounds not here apposite, 2 Cir., 10 F.2d 30." (Gentzel v. Manning, Maxwell & Moore, 2 Cir., 1956, 230 F.2d 341.)

19. They were frequently changed, as apparent impasses were reached in the Patent Office.

20. The court is mindful of, and has sought to apply, the limitations announced in Denominational Envelope Co. v. Duplex Envelope Co., 4 Cir., 1935, 80 F.2d 186, 192–193, as to the lack of significance of arguments by solicitors in proceedings in the Patent Office.

21. Numerous pretrial conferences, and hearings on preliminary motions, were held—all elaborately briefed. The trial itself extended over twenty-nine court days, not counting four days of travel in which the court, at the request of the parties, gladly visited plants of licensees and of the defendant. Plaintiffs filed 458 exhibits and defendant 543 exhibits. Some of these consisted of file wrappers of patents, in the hundreds of pages, and

pamphlets, printed publications, patents and correspondence, amounting to thousands of pages. After the last day of trial, counsel were permitted to file briefs, which exceed 600 pages, followed by two days of arguments. Submission of new cases, and references to modification of plaintiffs' licensing procedures and new British patent action, thereafter extended over a period of months.

22. Really, under the direct teaching of the application, the crossings would be through at least *two* insulating bases. That the application did not conceive of patterns "printed" on two sides of the same base is clear from any ordinary construction of the instructions given; and from the fact that printing and superimposing back to back two separately completed patterns is inconsistent with simultaneous creation of both on opposite sides of the same base.

Plaintiffs now contend that printing on both sides, and printing separately and "superimposing" or "superposing", are equivalents. This contention is specifically dealt with later.

23. Column 6, lines 18–38.

the preparation of a printing plate, the printing from it of a representation of the conductors of the circuit component, thereby differentiating on the printed surface the areas which are required to be conductive from those which are required to be non-conductive, and the subjecting of the surface to an after treatment which operates differently on the differentiated parts and converts the differentiation into a differentiation of conductive and non-conductive areas. The imprint made is a positive imprint, that is to say the inked part represents the conductors of the component; and the imprint is made on metal; and the component is completed by removal of metal from the unprinted areas. It will be seen below that it is not essential that the imprint be positive, nor that the imprint be made on metal, nor that the component be developed by removal of metal."

However, as indicative of Eisler's belief in the pioneer nature of his invention, as encompassing all types of "printed" circuitry, and which soon plagued him in his British applications, and also in the United States Patent Office, he stated that it was *not essential* that the imprint be made on metal; or that the circuit component be developed by the removal of metal. Various alternative, and apparently equally satisfactory and equivalent methods, were recited. E. g.:

(1) Printing on metal foil upon a conductive backing of another metal, the transfer of the conductor to a permanent base, after which the unwanted backing may be removed by electrolysis or "otherwise." (Column 6, lines 39–48.)

(2) The metal foil, instead of being removed "wholly" may be converted into a non-conductor by anodizing.[24] (Column 6, lines 48–54.)

(3) The circuit component may be produced by adding metal. The printing plate prints a negative of the circuit component, and additional metal, such as copper, may be added to the exposed portions by electrolytic deposition. (Column 6, lines 62–68.)

(4) The printed foil may be coated by galvanization. (Column 6, lines 67–74).

(5) A positive imprint of the circuit component may be made by adding metal to the printed surface not requiring the print to be made on metal; that is, it may be made in sticky ink on an insulating ground, and the imprint may be "metallised" in various ways:

(a) Metal leaf may be applied to the printed ground, and the non-adhering parts removed by dabbing. (Column 7, lines 13–15.)

(b) Metal powder may be dusted and consolidated (Column 7, lines 16–21)[25] by spraying with a molten or soft metal (Column 7, lines 23–31); or the dusted metal may consist of metals with a low melting point and a less readily fusible metal which unite by heating (Column 7, lines 31–42); or by galvanizing (Column 7, lines 43–44); or by heating in the vapor of a metal compound which readily dissolves (Column 7, lines 44–50).

(c) Conversely, the printing plate may print a negative of the circuit component, and the imprint may be made in ink to which metal will not adhere, upon an insulating surface to which it will adhere, and thereafter metal leaf is applied or metal powder is dusted on and consolidated as previously described (Column 7, lines 60–68).

As has been previously set forth, plaintiffs rely heavily upon the use of "foil" as an essential factor in the patent claims. The above summarized portions of the specification seem to negate this essentiality. In fact, the specification in its reference to "one form of the inven-

---

24. Literally, this would be inoperative. Any foil not "wholly" removed would remain as a conductor, and short out the printed circuit.

25. This is particularly interesting. In the course of the prosecution Eisler claimed, apparently successfully, that cited art to this effect was inoperative. One of his British Patents is for this very process.

tion, convenient for the instance under consideration" (Column 4, lines 56–58), after referring to foil of the thickness and nature required, states (apparently defining foil) that "metallized or metal-coated paper is one material" (Column 4, lines 64–65); or "a metal coating may be applied to a pre-formed sheet of insulating material * * *" (Column 4, lines 69–70).

The original 19 claims each recited the step of preparing a printing plate and then printing a representation of some or all of the conductors. Claim 10, which after many amendments, became Claim 1 of the patent as issued, called for two drawings which together included all of the connections with overlapping junctions which registered when superposed, and called for perforations of the two sheets at points where required, superposing the two sheets, and making metallic connection between them through the points of perforation.

In the first Office Action of July 13, 1944, all claims were rejected on Ducas, 1,563,731 [26], in view of Norris 2,282,-203 [27]. Ducas was primarily concerned with the use of an electrolytic process for the manufacture of coils. He states that an object of the invention is "to provide a system in which sets of tools, dies and templets may be originally constructed from which electrical circuits and inductances may be struck off by processes of printing, painting or applications of decalcomania process, whereby a film of conductive material may be deposited or exposed upon a surface over which a conductive layer having extremely low radio frequency resistance may be deposited in the formation of the electrical windings and circuits." [28]

Ducas also frequently refers to an object of the invention as being the production of "circuit connections between various pieces of electrical apparatus comprising the complete apparatus." [29] He discloses the use of a "blank" of metal (of unspecified thickness) over which a "film" of non-conductive material is coated; a spiral groove is cut by a turning lathe through the film; the exposed conductive material is electroplated, the remaining film of [non]conductive [30] material is "scraped off or otherwise removed" and the blank melted away from the electro-plated spiral.

The use of a decalcomania of conductive paste; the placing of plastic conductive material in grooves cut in non-conductive material, followed by electrodeposition; and the use of a "printing device" to print a spiral in conductive paste, followed by an electrolytic bath, are also disclosed.

Of interest, although not mentioned by the Examiner, is the fact that Ducas discloses the formation of conductors on opposite sides of a panel; the use of a vertical and of a horizontal panel; the superposing of two or more panels; and "a method which may be employed for interconnecting the circuits in different planes." [31]

Norris '203 is significant primarily in that it discloses the use over a fine screen of a deposited base of copper of "a substantial thickness, which, however, is not critical"; the laying on of a nickel layer of sufficient thickness to protect the copper from an etching agent; the application to the nickel of a coating of a light-sensitive shellac, resistant to the etching agent which is employed to etch the

26. United States Patent 1,563,731, issued December 11, 1925 to C. Ducas on application filed March 2, 1925, for "Electrical Apparatus and Method of Manufacturing the Same."

27. United States Patent 2,282,203, issued May 5, 1942 to E. O. Norris on application filed January 31, 1941 for "Stencil."

28. Page 1, lines 47–60.

29. Page 1, lines 14–16; see also page 1, lines 20–23, 28–29.

30. Page 2, lines 97–98 refer to the remaining film of "conductive" material 2 being scraped off or otherwise removed. This is plainly a typographical error. "2" is clearly the nonconductive film; and the immediately following language refers to melting away of the conductive blank from the electroplated spiral.

31. Page 3, lines 121–123.

nickel; photoprinting a design on the coating by a plate exhibiting a positive of the design, the unprotected area being hardened and insoluble in water; washing in water, which dissolves the protected area and exposes the nickel previously covered; etching through the exposed nickel with an etchant that does not attack copper; continuing the step with an etchant which will attack copper but not nickel, and dissolving the copper to the point where the copper layer is etched free and clear of the lands of the base screen; i. e., deep etching through the exposed copper.

The Examiner also cited patents to Spalding, 1,709,327 [32] and Hohnan, [sic] 2,279,567.[33] Spalding sought to prevent undercutting in the preparation of etched half-tone plates of relatively great depth, accomplished by several etchings or "bites". The well-known use of a metal plate, coated with a light-sensitive coating, exposed, developed, hardened, and etched is followed, but thereafter a resist is applied to the sides of the etched figures to prevent undercutting. Holman taught the formation of closely spaced fine metallic lines and meshes by blocking out certain areas and electrodeposition therebetween.

In rejecting a number of claims on Ducas, the Examiner pointed out that under Ducas:

" * * * The printing area may be made conducting or non-conducting as one may wish so that either a positive or a negative reproduction [34] is formed. The folding over is an obvious expedient and it is immaterial what the shape or form of the conducting lines may be made to assume."

" * * * Etching through a metal layer as taught by Norris is an obvious method of getting the design of Ducas. The two fundamental methods of obtaining a design is [sic] to form a continuous metal layer of the desired metal and remove select areas by etching as taught by Norris, and the method of Ducas in which the metal coating is placed on select areas by a first plating step. These two are thought to be generally interchangeable without involving invention."

In the response, dated December 29, 1944, Eisler attempted to distinguish Ducas in that it was claimed that Ducas purported to make his imprint in conductive paste and effect an electrolytic deposition; that this did not include the final step of the Eisler process of subjecting the surface to a treatment of the differentiated parts changing the differentiation into a differentiation of conductive and non-conductive parts; and that Eisler's research led him to believe that it was not possible to make a conductive imprint.[35]

In the next Office Action, of June 19, 1945 the Examiner cited, and made of record, Baynes 378,423 [36] without any discussion as to its application or teachings. Baynes was interested in ornamentation of metals, stone or the like, by producing recesses or perforations therein. Perforations of a thin plate of metal or marble may be effected by operating from one side only. In this situation one surface of the "plate" is prepared for the reception of the pattern which is applied in a coating of acid resist, leaving exposed the parts to be etched. The resist pattern may be applied "by printing the same directly by the use of a lithographic press;" or by a transfer process; or the surface may be complete-

32. United States Patent 1,709,327, issued April 16, 1929 to A. H. Spalding, et al., on application filed September 19, 1925, for "Halftone Photomechanical Printing Plate and Method for Producing the Same."

33. United States Patent 2,279,567, issued April 14, 1942 to H. E. Holman, on application filed October 26, 1938 for "Meth-od of Producing Thin Strips of Material on a Supporting Surface."

34. This would be a "negative resist" process.

35. See footnote 25.

36. United States Patent 378,423 issued February 28, 1888 to J. Baynes, on application filed May 28, 1887, for "Method of Etching on One or Both Sides."

ly covered by a light-sensitive resist, parts rendered insoluble by photographic use of a proper negative, and the soluble portions removed. The edges and back are then coated with an acid resist, and the plate immersed in etchant, or exposed to fumes of an etching-acid. If the plate is too thick to be etched through from one side only, patterns are placed on both sides, those on opposite sides being the reverse of each other.

The remarks of the Examiner on the Eisler claims were rather caustic. He said in part: [37]

"* * * There is no specific co-operation between the making of the printing plate, well known in the art, and the etching or removal of the unwanted parts of the metal. The one may be performed entirely apart from the other. In the first place the design may be applied by means other than a printing plate, for example, by hand or by a stencil.[38] Furthermore, the printing plate has many uses other than for printing a resist on metal. For example, it may be used to print on paper.

＊　＊　＊　＊　＊　＊

"The claims are further rejected as being unduly multiplied. For such a simple invention, it seems that two or three claims should be ample to cover whatever patentable subject matter which [sic] may be present."

After an even more caustic reply by O'Dell, asking a reconsideration of all claims, the Examiner, in Office Action of October 14, 1946, added Seymour 1,647,-474 [39] as an additional reference. In response to the argument that Baynes is not concerned with the making of electrical conductors, the Examiner recognized that this might be true, "but since applicant employs exactly the same steps as set forth in the reference, it is patentably immaterial that he performs his process with a different purpose in mind. The part of the claims 'method of manufacturing electrical circuit components' is merely introductory. Obviously, if applicant obtains electrical circuit components, the reference does also." [4']

Seymour's invention relates to means for transmission, reception and control of electrical impulses or wave motions, and particularly means constituting pathways as distinguished from circuits. A flexible, pliable insulating body is used, on which a pattern is formed "by any well known means" such as the placing thereon of lead, graphite, solution of copper or any other conductive material, which serves as the cathode for electrolysis. In specific examples, coils of right and left turns are so designed that they may be directly superimposed, with cross connections, and connections through the insulating sheets.[41] Coils and condensers are shown, but these are said to be but a few of the many possible variations or forms. It is further stated that:

"* * * the deposit elements may be in the nature of disks or films of sheet metal * * *." [42]

The Examiner further rejected all claims as involving no invention over Seymour in view of Baynes.

"* * * Seymour shows the making of electrical conductors by depositing the metal in certain selected areas. To employ the etching method of Baynes for limiting the conducting material to the desired areas would be obvious." [43]

Applicant was directed to prepare the application for final action. No response was ever filed to this Office Action. By letter dated November 19, 1946 and re-

---

37. DX 488; File Wrapper, pages 61–62.
38. Or by a turning lathe; or decalcomania.
39. United States Patent 1,647,474 issued November 1, 1927 to F. W. Seymour, on application filed October 25, 1923, for "Variable Pathway."

40. DX 488, page 70.
41. Page 2, lines 36–47; figures 1 and 3, numbers 13, 13' and 17.
42. Page 2, lines 78–79.
43. DX 488, page 70.

ceived in the Patent Office on December 12, 1946 application was made for priority under Public Law 690 (Boykin Act), from the British Application No. 1749/43 filed February 2, 1943 and two other applications filed in 1943. (It is not clear from the record whether the first British action, in November 1946 had occurred before this letter was sent. It certainly had, before the letter was received by the United States Patent Office. No reference to said British Action, or the therein cited art, appears in the prosecution of the '960 Patent.)

The next Office Action, made on February 11, 1947, added as additional references of record Norris 2,166,367 [44], Wermine 1,718,993 [45], Arlt 2,066,511 [46], and Reid 2,268,619 [47].

All claims except Claim 10 were rejected as unpatentable over Norris '367 "who applies metal foil [48] to glass and then etches out the unwanted metal. To employ a printing plate method of defining the areas to be etched out would be obvious in view of Baynes. The idea of making conductors by applying metal to an insulating backing is old as shown by Ducas, of record, or Arlt, above cited.

"Claim 10 is rejected as involving no invention over Arlt in view of Norris and Baynes. Nothing unexpected is accomplished in applying the metal conductors of Arlt by the etching method shown in Norris in conjunction with the printing plate method of Baynes."

The Examiner then refers to an oral interview of February 6, 1947, the nature of which and the participants therein not being disclosed, at which the references and claims were discussed, and at which applicant agreed "to submit one or two claims similar to Claim 10 but more clearly setting forth the idea of etching the foil to form electric circuit parts in cooperating relationship on opposite sides of the insulating backing * * *."

Arlt was concerned with "a multiple wiring device for connecting the terminals of electrical apparatus. The device is particularly adaptable for use in connecting the terminals of apparatus of the type mounted in groups on insulating panels." [49] It specifically was directed to the elimination of point-to-point wiring.[50]

Conductive strips were applied to insulating panels by the well-known Schoop spraying process. Mounting holes and terminals were provided. Its adaptability to mass production was expressly claimed. It specifically discloses a plurality of mounting panels superimposed one

44. United States Patent 2,166,367, issued July 18, 1939 to E. O. Norris, on application filed December 6, 1934, for "Process for the Production of Metallic Screens."

45. United States Patent 1,718,993, issued July 2, 1929 to H. H. Wermine, on application filed September 9, 1927, for "Wiring Panel for Electrical Apparatus."

46. United States Patent 2,066,511, issued January 5, 1937, to H. G. Arlt, on application filed July 20, 1935 for "Wiring Device."

47. United States Patent 2,268,619, issued January 6, 1942, to J. R. Reid, on application filed January 8, 1938, for "Radio Receiving Apparatus."

48. DX 488, page 98. The portion of the specification to which the Examiner perhaps was referring is Page 3, right column, lines 15–20, where Norris refers to attaching a "thin sheet of electrolytic copper," which may be less than 0.0030"

and is preferably less than 0.0015" thick, to plate glass by adhesive tape.

The Examiner may, however, equally have been referring to page 2, left column, lines 25–32 where a "thin sheet * * * of metal" preferably electrolytic copper, of about 0.005" was attached to plate glass.

In the case at bar, "foil" referred to copper, rolled or electrolytic, of about 0.003". Certainly the Examiner, in his reference to Norris, showed no comprehension that "foil" was an Eisler term of art.

Norris further recites the application to the face of the "sheet" of an etch-resistant design by the application of a sensitized coating, the sheet being put under a flat-screen negative, exposed to light, and washed.

49. Page 1, left column, lines 1–6; 31–43.

50. Ibid., lines 14–31.

on the other, each being provided with suitable connecting strips. Terminals are provided for connections to the external circuits. Also, terminals are provided for inductances and condensers on the mounting panel.

Wermine and Reid, "cited as of interest" [51] are at least that Wermine relates to wiring electrical panels, and specifically to means for wiring a radio set. It particularly seeks to provide means for wiring such electrical apparatus easily and quickly by unskilled persons; without numerous or expensive tools; and to "enhance the appearance of a connected group of electrical devices by eliminating the usually numerous exposed wires extending in various directions and also by grouping such devices according to a predetermined plan." [52]

A bakelite panel of other pliable semi-cured insulating sheets are suggested. The conductors are of relatively thin strips of electrical conducting material such as copper or brass, with terminal portions. Superposing of three sheets is disclosed, with terminals projecting outwardly for receiving connections with power sources "or other electrical devices." [53] Switches, condensers, transformers and tubes may be connected to the apertures.

Reid is concerned primarily with the construction and method of assembly for a radio receiving apparatus. Standardization and compactness are sought, with replaceable units. Insulation plates between and on which are placed conductive plates and straps having plugs or sockets extending outward to both sides are called for. Stamping out of insulation plates and conductors is recommended.

Another personal interview, the nature of and parties to which again are not disclosed, was held on May 15, 1947, as a result of which an amendment was filed dated July 9, 1947, cancelling all claims except Claim 10, which was substantially amended and issued as Claim 1, and adding six new claims which as issued appear as Claims 2 to 7, inclusive.

In the Remarks it was said that each "claim brings out the concept of the method of formation of an electrical unit, incorporating spaced complementary circuit paths defined by the non-removed foil layer of a composite sheet" [54]; the separation out of the remainder of the "foil layer" not imprinted [55]; and superimposition and connecting the respective conductive designs by conductive means passing through the insulation backing. Imprinting and removing the portion of the foil outside of the design by any means, but not necessarily restricted to etching, is defined.

It was conceded that Eisler was not the first to have made a proposed electrical circuit path as a flat surface conductor in the nature of a bus-bar, nor the first to provide a circuit outline by imprinting or coating and subsequent treatment, e. g. electro-deposition.

The asserted invention was stated to be: [56]

" * * * Applicant does, however, consider that he is the first to have formed an electrical circuit system involving crossing connections wherein a composite sheet of *conductive foil* mounted on an insulation backing is treated as by imprinting a design of a particular configuration to provide upon separation of the non-imprinted design as by etching or physical displacement so that there are provided as sub-circuit parts conductive paths following the design imprinted on the foil; so that a series of such sub-circuit parts when superimposed and connected would provide with a minimum of space all of the necessary wiring connections requisite for proper functioning of a radio receiver through the application only of the normally

51. DX 488, page 99.

52. Page 1, left column, lines 30–35.

53. Page 2, left column, lines 27–29.

54. Note the language: "foil layer"; "sheet".

55. DX 488, page 104.

56. DX 488, page 105—emphasis in text.

separable parts such as vacuum tubes, etc."

Without further resistance, or explanation of how the references of record had been overcome, the Examiner yielded; the application was formally allowed on September 2, 1947; and the final fee was paid on February 27, 1948, with a request for deferment of issuance for the longest period permissible, so that applicant could "avail himself of reasonable time for the safe arrival of corresponding patent applications being filed in foreign countries."

'697—This is a division of application Serial No. 11,798, filed February 27, 1948 (the day on which the final fee was paid on the original application, but as to which applicant requested deferment of issuance so that applicant could "avail himself of reasonable time for the safe arrival of corresponding patent applications *being filed in foreign countries"*) (Emphasis supplied) later Patent No. 2,587,568, itself a division of application Serial No. 520,991, filed February 3, 1944, now Patent No. 2,441,960, issued May 25, 1948.

The claims relate to two aspects: (1) production of a "component" of electric and magnetic circuit systems, comprising a composite sheet material of an electrically conductive foil backed with a temporary support, printing a representation of the pathway pattern on the foil, removing the portions of the foil not forming a part of the pathway pattern, and placing the pattern on a permanent support; and (2) "printing" a negative resist pattern of the desired pathway pattern upon an insulation backed foil, depositing a "layer" of metal dissimilar to the metal of the foil upon the exposed parts of the foil, removing the representation from the foil, and finally removing by chemical action the foil exposed by the removal.

In the first Office Action of July 14, 1952, references were made of record:

Eisler (British) 639,111 June 21, 1950 41-Pr. Cir.

Eisler (British) 639,178 June 21, 1950 41-Pr. Cir.

Eisler (British) 639,179 June 21, 1950 41-Pr. Cir.

The claims were rejected on the above British patents, constituting a statutory bar; the Examiner pointing out that the oath was defective in failing to include a reference to these British patents.[57]

In response, by communication dated January 6, 1953, applicant modified the original claims by changing conductive "material" to conductive "foil". The British patents were sought to be distinguished as being simply "applications" and not patents, not having been "sealed".[58]

In Office Action of February 6, 1953, the following references were made of record:

| Miller | 1,804,201 | May 5, 1931 | 41/Pr. Cir. |
| O'Connell | 2,288,735 | July 7, 1942 | 41/Pr. Cir. |
| Littledale (British) | 327,356 | April 3, 1930 | 41/Pr. Cir. |

All claims were rejected as fully met by each of the references. The Examiner plaintively repeated his position:

"The claims are further rejected as unduly multiplied. The several claims are not patentably distinct. For such a relatively simple process two or three claims at most should be ample to cover whatever patentable subject matter may be present."

"O'Connell is cited to show the further state of the art. Note par-

57. DX 491, page 27.

58. Even if not "anticipations", 35 U.S.C. § 102, they were not negatived as representative of the art. 35 U.S.C. § 103.

ticularly page 2, column 1, lines 62–75.

"The rejection on the British patents is held in abeyance." [59]

By letter dated April 28, 1953 and received in the Patent Office on May 6, 1953, applicant requested that the application be placed under Public Law 690 (the Boykin Act) and that the convention dates of the British applications 1749/1943, filed February 2, 1943, and 5379/1943 filed April 3, 1943 be granted.[60]

Additional claims were filed, mostly as to transfer methods.

After claiming that a number of primary and secondary steps are involved, disclosed and claimed, the "invention" is stated to be:

"The concept of the invention which is common to all the claims resides in printing upon an insulation backed metal foil a representation of the desired final conductive pathway pattern and then removing those areas of the foil that do not constitute part of the desired circuit pattern." [61]

The communication refers to the transfer aspects, and seeks to distinguish Littledale, admittedly describing a process of making inductances and transformers from an "insulation backed foil * * * coated with an acid resistant varnish." The circuit pattern is then traced by means of needles or similar tools, and the metal thus exposed is etched away and then the "varnish covering the remaining parts of the foil is dissolved." It is also admitted that Littledale mentions that the pattern may be transferred to another backing.

The primary distinction claimed is that Eisler's "method has the advantage that any number of circuit patterns, however involved, can be produced *once the printing die has been cut.*" [62] Also, Littledale does not mention anywhere the deposition of additional metal upon the foil areas constituting the final pattern. Finally, it is argued that Littledale does not suggest that the foil is backed by conductive metal.

Miller, although using the light-sensitive technique, is said not to be "suitable for producing circuit patterns on a mass production basis." [63]

It is also questioned by Eisler if Miller's use of a metallized powder and deposition is practicable.[64]

O'Connell, stated to be concerned with a method of making electrostatic shields, also admittedly uses an insulation backed foil, and suggests the print and etch method, which he describes as inferior to the use of a hot die. O'Connell does not mention the deposition of metal upon the retained areas of the metal foil, or the transfer from a temporary to a permanent support.

In Office Action of February 5, 1954, Eisler 2,441,960, May 25, 1948, 41–Printed Circuits, was made of record, and in a final rejection, the Examiner stated:[65]

" * * * The claims, namely 1 to 29, are rejected as unpatentable over Miller, O'Connell or Littledale, all of record considered alone or together with Eisler, above cited. Miller discloses the forming of a metal de-

59. DX 491, page 36.

60. Note again that no reference is made to the action of the British Examiner of November 1946; or of the Eisler disclaimers occasioned thereby.

61. DX 491, page 66.

62. DX 491, page 68; emphasis added.

63. United States Patent 1,804,021, issued May 5, 1931 to F. W. Miller on application filed March 29, 1930 for "Process of Reproducing Designs in Metal" specifi-

cally states that the process is one "of reproducing designs in metal by means of photography and electro-deposition."
This case, in all its ramifications, has disclosed no process better suited for mass production than the photographic process; and electro-deposition follows metallic paths uniformly, regardless of the inventor, or the method by which the paths have been produced.

64. Again, see footnote 25.

65. DX 491, pages 73–74.

sign on a temporary base as by electroplating and then transferring said design to its permanent base. O'Connell employing an acid resist etches a metal foil applied to a flexible base. Littledale produces an electric circuit component on a flexible backing by depositing metal thereon as desired. Additional metal may be applied as desired. Eisler, applicant's own patent, covers the idea of making a printed circuit from etched designs on a suitable backing material. These claims merely recited the obvious combined features judiciously selected from the prior art as shown by Miller, O'Connell, Littledale and Eisler. Nothing critical is present in the several distinctions argued by applicants. Whether the design is positive or negative is patentably immaterial."

In an answer, dated July 21, 1954, applicant cancelled a number of claims; stated that all the remaining claims recite "foil" as the starting material, and representatively recite that a "negative representation of the pathway pattern to be formed is *printed* upon the foil"; [66] that metal is deposited in the areas not imprinted; and that foil is removed from the imprinted areas. It is admitted that the individual steps may be found in the references, although it is claimed that these are in different combinations. It is further admitted that "there is no problem to produce and [sic] insulation backed conductive pathway pattern. The unwanted areas of metal foil may be removed by cutting, stamping, etc.; and the pattern may be drawn by hand with a conductive paint on an insulation layer and then be built up by electro-plating * * *." [67]

The use of metal foil is stated to be the solution, assuring a "sound and solid base for the subsequent deposition of strengthening material" and lending itself to transfer operation. [68]

Miller again is discounted on the lack of uniformity or conductivity of the powder base. [69]

Littledale is recognized as starting with metal foil, but: "This feature as such, is of course, not claimed by the applicant." [70]

O'Connell is recognized as starting with insulation backed foil, and as mentioning the print and etch method, "now generally accepted in the industry."

Eisler '960 is recognized as starting with insulation clad metal foil, printing a representation and removing the unwanted foil "for instance, by an etching operation." But electro-deposition results under certain conditions in a more advantageous printed circuit product than is obtained by retaining the original foil. [71]

By Office Action dated December 3, 1954, all claims were rejected on the additional reference of "Rubin, 2,443,119, June 8, 1948, 204–18" as a "statutory bar, since applicant failed to copy the claims thereof within one year for purposes of interference. * * * The application of greasy ink and covering with a powdered insulating material are conventional steps in the preparation of printing plates."

By letter dated January 17, 1955, new claims were filed. Rubin was distinguished as not having a filing date making it a statutory bar. Also Rubin recited the use of greasy ink, the use of powdered insulation plastic material, hardening the insulating material and removing the powdered insulating ma-

---

66. DX 491, page 76; original emphasis.

67. DX 491, page 77. This equivalence of etching with cutting and stamping is deeply significant.

68. Poor adherence of the cathode metal to the insulating base would of course facilitate transfer.

69. Again, see footnote 25.

70. DX 491, page 79.
 In fact, "of course" starting with metal foil *is* claimed by the applicant, and by his counsel in the prosecution of the suit.

71. DX 491, page 80. If this is the case, then the electro-deposition or other deposition of a thin "layer" in situ on the insulating base would seem preferable to the use of bonded "foil".

terial and the greasy ink. "The use of the aforelisted materials and the aforetested steps are clearly not disclosed by the applicant and cannot be copied by him." [72]

Further, it is contended, Rubin refers broadly to a "predetermined pattern to be reproduced" while all but the last two of applicant's claims are limited to a "negative representation." [73] Further, Eisler recites that "the additional metal to be deposited is a metal *dissimilar* to the metal of the base metal." [74]

The Examiner again completely capitulated and allowed all the claims by Office Action of January 28, 1955. He further held on February 24, 1955 that it was not necessary for applicant to rely upon Public Law 690 (Boykin Act).

'165. By application No. 41,267 filed February 25, 1954, Eisler sought to surrender Patent No. 2,587,568, issued February 26, 1952, and to secure a reissue "for the same invention upon the following amended specification." The amendments consisted in the *elimination* from the specification in '960 of references (a) to development of the component by removal of metal; (b) to transfer; and (c) to modification of methods of production by metallization.

The original eight claims of '568 were set forth followed by new claims 9–18, all relating to a method of manufacturing a component of an electric circuit of such weak mechanical structure that it is incapable of self-maintenance, the component "including at least one conductor linking at least two terminals of said electric circuit of different operating potentials and including metallic joints for at least one other electric device not contained within said component" comprising metal foil on an impervious insulating backing, printing a representation of the conductive pattern of the com-

ponent, "including junction points which register with said metallic joints * * *" and "subjecting the metal foil to a chemical action utilizing the differentiation resulting from the imprint to produce a differentiation of conductive and non-conductive parts of the metal foil." Claims 14–18 relate to "printing" on both sides of metal foil on an impervious backing. As to both the single and double sided applications, claims are made as to "printing", "printing by means of engraving on a plate", "printing by means of lithographic stones", "printing by means of a photomechanical process" and "printing by the off-set method."

The accompanying oath states that Eisler "believes the original patent to be partly inoperative or invalid by reason of your petitioner claiming less than he had a right to claim in the patent."

The alleged insufficiencies and the "errors" are stated in extenso over four pages. [75] It is stated that all the claims in '568 relate to making electric connections at junctions whereas such steps are usually made by parties other than the manufacturers of printed circuit components; to wit, by the manufacturers of electric equipment. Also, all the claims were directed to "printing a representation", without setting forth the specific methods of printing; e. g. engraving, lithographic stones, a photomechanical process or offset printing. These "errors" are alleged to have arisen because the applicant was not skilled in American Patent law, and so failed to note "that the steps essential for manufacturing the printed circuit component proper which constitute the chief point of novelty of the invention were unnecessarily tied up with a step, to wit, the making of electric connections * * * which might be omitted without detract-

---

72. DX 491, page 96.

73. This is the height of casuistry. The "negative representation" is but the first step toward the production of the "predetermined pattern to be reproduced."

It is difficult to understand how the Examiner permitted this assertion to remain unchallenged or unrebuked.

74. DX 491, page 96—emphasis in the original. Note the reference to "base metal" and not base foil.

75. DX 490. File Wrapper, pages 16–20.

ing from the practicability or patentability of the method according to the invention". Applicant also failed to note that the claims did not include the various methods of printing set forth in the original specification.[76] The "errors" occurred because the "art of manufacturing printed circuits was a *relatively* new one" at the time the application was filed.[77] The prosecution was hampered by the fact that the English attorneys had to act through associate attorneys in the United States, not skilled in the printed circuit art; with whom applicant was not able to confer "as frequently as desirable". Eisler further swore that the errors "occurred through inadvertence, accident and mistake."

Because the patent as issued perpetuated these "errors", and because of this court's views on validity, a detailed comparison of the oath with reality is not necessary. The oath was prepared by Eisler's then American attorney[78]; was at the best disingenuous, and if necessary for the decision of the case would be found by the court to be dishonest. It was, as most of the patent papers, executed at the very latest possible date, and in substance was repudiated by O'Dell, Eisler's British Patent Agent; who, however, took no steps to see that it was withdrawn or corrected.[79]

Following what had become almost a stereotyped pattern, all claims were rejected by Office Action of April 8, 1954; 1–8 on the ground of double patenting on '960; the Patent Office having been affirmed by the courts on Serial No. 11,796 "involving this very same question."

Claims 9–18 were rejected on an insufficient oath; and on the further ground that in any event, if there were to be a reissue, it should be of '960.

Claims 9–18 were further rejected on grounds of estoppel, as not patentably distinguishable from the original claims of Serial No. 520,991 ['960].; and as of the same scope as claims cancelled in Serial No. 11,798.

O'Connell 2,288,735[80], and Littledale (British) 327,356[80] were made of record.

The Examiner said:[81]

"Claims 9 to 18 are further rejected as fully met by O'Connell. The exact process steps recited are present in O'Connell. As far as the process is concerned, it is patentably immaterial whether the resulting article is an electrostatic shield or an electric circuit. In fact, electric 'component' is broad enough to read on the electrostatic shield of the reference.

"Claims 9 to 18 are further rejected as involving no invention over Littledale. The printing recited is not critical over the broad application of the resist material of Littledale. In fact, 'printing' is considered broad enough to read on the making of the resist design in any manner such as that of Littledale."

In response, applicant by communication dated October 5, 1954, filed new claims 19–30, essentially the same as claims 9–18, except the new claims referred to at least one conductor "linking at least two terminals of said electric circuit of different operating potentials".

As to double patenting with respect to claims 1–8, it was argued that the said point had been decided in Eisler's favor in the prosecution of '568.

---

76. Reference will be made to the later claim that printing covers all methods of producing a representation.

77. DX 490, page 19; emphasis supplied.

78. Not plaintiffs' trial attorneys, who had no part in the prosecution of any of the patents. Any criticism, explicit or implicit, of Eisler's patent attorneys does not relate to plaintiffs' trial counsel, who conducted themselves with complete propriety and integrity—as did defendant's counsel.

79. The court has endeavored, it hopes and believes successfully, to treat the Eisler applications and alleged prior art, on their intrinsic merits only, not on any 'ad hominem' basis.

80. See same patents, briefly mentioned in the prosecution of '697.

81. DX 490, page 32.

Applicant argued that all claims in '960 involve crossing connections between superimposed representations; claims 1–8 of '568, and the current application are not concerned with crossing connections or superimposing. Serial No. 11,798 was stated to have been concerned with three dimension electric and magnetic circuit components in different planes, and with "folding".

As to the oath, it was stated that the printed circuit product was a commercial item without the step of making connections[82], which step might be made by another.

It was asserted that the claims of Applications 520,991 and 11,798 do not contain the limitations in new claims 9–18:

(a) "At least one conductor linking at least two terminals of said electric circuit of different operating potentials."[83]

(b) "Metal joints for at least one other electric device not contained within said component."[84]

(c) "Junction points which register with said metallic joints."[85]

These admittedly were inserted in '568 in an endeavor to distinguish it from O'Connell.[86] Further, it was urged that O'Connell did not show the use of the photomechanical process.

As to "printing", it was urged that as of February 1943, the printed circuit art as now known was not in existence, and at that time "the use of the photo-mechanical process, printing by means of lithographic stones, etc. was definitely new and inventive in application to printed circuits."[87]

Littledale admittedly "discloses the step by removing unwanted areas of the foil by an etching process"[88] but does not disclose "printing" although:

"Printing is defined in the dictionary as the art of reproducing a design upon a surface by any process."[89]

It is argued that the possibility of reproduction is the basic concept of printing, requiring some "tool, die, printing plate, type or other form of carrier" (emphasis supplied) while Littledale "is in the nature of individual engraving rather than printing. Each product of Littledale is in effect an original, and cannot be duplicated for all practical purposes. Obviously, the method of Littledale is not suitable to make a multitude of printed circuit products which are exactly alike."[90]

(Although it breaks the continuity somewhat, the fallacy of this argument is so significant that the court cannot resist comment. Littledale's patent claimed "Improvements in and Relating to Electric Inductances and Transformers." He discloses the use of a sheet of copper foil on a flexible backing, marking out the desired configuration by means of "a needle, cutter, stamp or other scribing or cutting tool" and "etching out the marked portions by means of an acid bath * * *."

---

82. Except as a museum piece, or as a "component" of a modernistic mobile, it is difficult to conceive the utility of a printed circuit which did not have connections made to it. Until such is done, it is only potentially an electrical circuit.

83. If there were not a difference of potential, there would be no flow of current through the circuit.

84. If the circuit is only a pathway, it is nothing more than an unnecessarily expensive transmission line.

85. "Junction points" and "metallic points" were the subject of extended, and completely contradictory, testimony and arguments at the trial.

86. To be further discussed; and not so summarily dismissed.

87. DX 490, page 51. Consider this, in the light of Eisler's British disclaimers; and the definition of "printing" obtained by Eisler from the Patent Office Board of Appeals in other prosecutions and argued in this application.
 If "consistency is the jewel of little minds", Eisler and his patent counsel will never be found wearing this jewel.

88. DX 490, page 51; emphasis supplied.

89. DX 490, page 52, quoting from National Bureau of Standards, Circular 468, issued November 15, 1947, pages 2–3.

90. DX 490, pages 52–53.

(At the Bendix plant, inductances were prepared from copper foil on an insulating backing. In one case, the copper was covered by a photosensitive resist, the print effected by a negative photographic plate, the unexposed surface removed by water, the exposed copper etched away by acid, and then the resist was removed. In the other (Littledale) a resist was deposited; it was cut through by a lathe ((capable of indefinite identical repetitions.)), the exposed copper was etched, and then the resist was removed. When the two end products were being examined, plaintiffs' counsel understandably inquired "Which is which?").

By Office Action of October 22, 1954, all claims, 1–30 were rejected on '960 as double patenting.

Claims 9–30 were again rejected on an insufficient oath and estoppel.

Claims 9–18 were again rejected on O'Connell, a "component" being broad enough to read on an electrostatic shield. They were also again rejected on Littledale.

Claims 19–30 were rejected as involving no invention over O'Connell or Littledale in view of Eisler. Both O'Connell and Littledale reveal the making of a circuit component by the resist etching process. "It would be obvious in view of Eisler to make electric connections at junctions of said circuits if desirable since this is taught in Eisler." [91]

The action was stated to be final.[92]

In response dated November 22, 1954, the applicant cancelled claims 9–18 and 27. Acknowledgment was made of an interview on November 23, 1954, with the Primary Examiner and the Examiner in Charge. No reference was made to the conferees on behalf of applicant. The added claims were said to specify the term "printing". It is stated that the two Examiners indicated that the reissue application would be allowable if all claims broader than those originally granted were cancelled.[93] It is further stated that objections to the reissue oath would be withdrawn if the reissue application were limited to claims more specific than the originally granted claims.

An "early allowance" was somewhat presumptuously solicited.

In Office Action of December 3, 1954, claims 1–8 and 19–26 were said apparently to be allowable. Claims 28–30 were rejected on Rubin 2,443,119, June 8, 1948, 41-Printed Circuit and Lokker et al. 2,506,604, May 9, 1950, 41-Printed Circuit as statutory bars for failure to copy the claims thereof for interference. This Action was supplemented on December 15, 1954, in which Claims 1–8, 19, 20, 22 to 24 and 26 were said apparently to be allowable. Claims 21 and 25 were rejected as not supported by the disclosure, which revealed a printing plate made by the photomechanical process, which plate was later used to print the resist on the foil.

Claims 28–30 were again rejected on Rubin and Lokker for failure to copy the claims for interference; and as not supported by the disclosure, since a printed plate, rather than the photographic method, is used.

In response of January 19, 1955, claims 21, 25, 28, 29 and 30 were cancelled, and new claims 31–36 were added, calling for the use of a printing plate, variously formed. Reference was made to another conference with the Examiner on January 5, 1955, the other conferees not being mentioned.

Rubin and Lokker are sought to be distinguished in that Rubin calls for the plating of metal upon the exposed conducting surface on the insulation base.

91. DX 490, page 56.

92. DX 490, page 56.
 This, again, is routine, but for once the Examiner stood his grounds and required an appeal.

93. This appears to be an elliptic statement that claims, to be allowed, must be narrower than those originally granted. The only possibilities would seem to be broader claims (allowable only if application is made within two years of the original grant); the same claims (which would not be allowable); or narrower claims.

Lokker is distinguished, among other grounds, in that it does not call for the making of electric connections at junctions.

By Office Action of January 27, 1955, claims 31–36 were rejected, again "as final."

By letter of April 21, 1955, it was asserted that a "full disclosure supporting the claims have [sic] been made in the complete specification filed in British Serial No. 1749/43 on February 2, 1944, which complete specification matured in British Patent 639,111." The British convention date of February 2, 1944 was claimed, and the claim for benefits of Public Law 690, August 8, 1946 (Boykin Act) was withdrawn.

By letter of April 21, 1955, new claims were presented, related to transfer.

It was also urged that by dictionary definition (Webster's Twentieth Century Dictionary (1949 Edition)) "print" included obtaining a positive from a negative. Imprint in the specification covers transfer from a printing plate; photographic printing upon a sensitized surface; contact printing or projection upon a sensitized surface. Printing "in an ink which serves as a resist", found in the original application, was "deliberately omitted" herein.[94]

Of special significance is the recognition (required by the clear language of the specification of '568) and urged (as a basis for allowance) that "metal layer" has a variety of definitions, being referred to as "metal *foil*"; "metal side"; "metal surface"; metal"; and "metal plate".[95] The communication was accompanied by an extended conclusory affidavit as to photomechanical process in manufacturing a printing plate, and that which follows the employment of the photographic plate as a printing plate in producing the circuit component.

By Supplementary Amendment dated May 4, 1955, applicant called to the attention of the Examiner language of the Board of Appeals on June 29, 1953 in Eisler Application Serial No. 11,797, holding that applicant "did not intend to be limited to the making of an imprint by application of ink by pressure from a previously shaped impression member in the form of a roll or stamp." Accordingly we are of the opinion that the *terms* *'printing'* and *'imprint'* require only the *reproducing of a design on a surface by* *ANY method.*"[96]

In Office Action of May 9, 1955, various new claims were again denied, the most significant ground being that the public, interpreting "printing" from the specification, would think that it means merely the idea of transferring the resist material from a printing plate to the surface of the insulated metal foil.

Withdrawal from Public Law 960 was denied. The action was stated to be "F I N A L."[97]

An appeal was taken from the rejection of the later claims and from refusal to withdraw the application from Public Law 960. In the brief, it is stated that:

"Basically, the printed circuit technique according to this invention and other inventions of the applicant is practiced by forming a representation of the ultimate circuit component on a suitable carrier, printing from this carrier a representation of the circuit pattern upon insulation backed *metal*-commonly referred to as laminate—and finally removing the unwanted areas of the metal, that is those areas which do not constitute part of the ultimate circuit component.

"The operational step with which this appeal is specifically concerned is *the printing step* * * *."[98]

Each printing operation starts with a lay-out of the "circuit component" from which a printing plate is prepared, from

---

94. DX 490, page 82.

95. DX 490, page 90—Emphasis supplied.

96. DX 490, pages 99–100. All emphasis supplied.

97. DX 490, page 105. Examiner's spacing and emphasis.

98. DX 490, pages 111–112. First emphasis supplied; second in original.

which the "imprint can be made upon the insulation backed *metal layer, generally* a *metal layer* in form of a sheet of *metal foil.* \* \* \*." [99] The printing plate may be engravings on metal; on lithographic stones; by photomechanical process; or photographic plates or film. There may be a transfer of ink; contact printing and removal of unwanted areas; or photographic printing.

It was further argued that the application was within two years of the original grant, and so might enlarge the claims; but that all claims on appeal have a narrowing effect.

The oath is said to show "error."

The Board of Appeals, without the citation of any of the art, other than the '960 patent, affirmed the Examiner as to his rejection of various claims except as to three, on which he was reversed. After rejection by the Board of a Motion for Reconsideration and Rehearing, and a refusal by the Examiner thereafter to consider new claims, and the belated and unsuccessful effort to have the Board review this action, the patent issued, with the present seventeen claims. [100]

## Validity

 The court is of course familiar with the statutory prima facie validity of a patent from the fact of its issuance (35 U.S.C. § 282); that the burden upon one attacking the validity of a patent is a heavy one (Mumm v. Jacob E. Decker & Sons, 1937, 301 U.S. 168, 171, 57 S.Ct. 675, 676, 81 L.Ed. 983) and that the presumption of validity may be strengthened by a showing that the best alleged prior art was cited and rejected by the Examiner (Otto v. Koppers Co., 4 Cir., 1957, 246 F.2d 789, cert. den. 1958, 355 U.S. 939, 78 S.Ct. 427, 2 L.Ed.2d 420). As to whether the failure of the Exam-

iner to cite certain art is consistent with its examination and rejection (Artmoore Co. v. Dayless Mfg. Co., 7 Cir., 1953, 208 F.2d 1, 4, cert. den. 1954, 347 U.S. 920, 74 S.Ct. 518, 98 L.Ed. 1075; Charles Peckat Mfg. Co. v. Jacobs, 7 Cir., 1949, 178 F.2d 794, 803, cert. den. 1950, 339 U.S. 915, 70 S.Ct. 575, 94 L.Ed. 1340; Adler Sign Letter Co. v. Wagner Sign Service, 7 Cir., 1940, 112 F.2d 264, 267, cert. den. 1940, 311 U.S. 692, 61 S.Ct. 73, 85 L.Ed. 448, reh. den. 1940, 311 U.S. 729, 61 S.Ct. 390, 85 L.Ed. 475) would seem to be dependent upon the pertinency of the uncited art. Understandably, an Examiner might see no occasion to cite of record art purely cumulative, or not as pertinent as that cited; although a mere reference by the Examiner to art considered but ignored, and not cited of record, to aid summary disposition of citations on the above grounds would be helpful to a reviewing court. Despite the Seventh Circuit decisions, this court would be inclined to conclude that the failure of the Examiner to cite of record art more pertinent (by the court's determination) than that in fact cited can mean only that either the Examiner did not correctly understand the uncited art [101], or else it was not brought to the Examiner's attention; the latter being the more likely.

 On the whole, this court prefers the view that the presumption of validity is weakened by the failure to cite a number of patents to be discussed (Gillette Safety Razor Co. v. Cliff Weil Cigar Co., Inc., 4 Cir., 1939, 107 F.2d 105, 107; Maibohm v. R. C. A. Victor Co., 4 Cir., 1937, 89 F.2d 317, 321.

 Moreover, in this case the initial rejection of the claims in the three patents on the cited art, but the final capitulation and issuance of the patents without

---

99. DX 490, page 113; emphasis supplied.

100. Applicant also sought to have the Examiner permit the withdrawal of his claim to the benefit of Public Law 690 (Boykin Act). The Examiner refused, on the grounds that the patent of which the reissue was sought had the benefit of that Law, and the reissue application was

bound by the same condition. He also found that the request was not supported by the reissue oath. The refusal was petitioned to the Commissioner of Patents as a "procedural" matter, and the Examiner was affirmed.

101. That is, his construction differs from that of the court.

any explanation of why or how the cited art formerly held to be controlling is now to be distinguished, weakens their prima facie validity. Especially is this so where, as here, the most significant allowances occur after conferences, with no record statement or summary of the matters discussed or the arguments producing persuasion; nor even any reference to the names of the conferees on behalf of the applicant.

In view of these circumstances, and the discussion heretofore with respect to the cited art, the court would be strongly inclined to hold that the Examiner was right in his original rejections; wrong in his retreats; and that the patents were invalid in view of the prior art.[102] When the available literature, both patents and publications, not cited, is considered, and also the ability of persons unaware of the alleged inventions to reach the same results by the same means, the court has no hesitation in holding the patents, and the claims in suit, to be invalid.

Eisler did not invent "foil"; or the method of bonding foil to an insulation backing; or the creation of representations upon metal by "printing" (including photomechanical methods), or of protecting the wanted metal; or of removing the unwanted metal by etching or otherwise. The court fails to see any patentable novelty in the method or process by which these previously known materials and practices are directed to be used. The case also is that of one who thought his invention was a pioneering one, and who therefore initially claimed more than he himself later realized could be claimed; and who therefore disclosed in his specifications a number of equivalents. Many if not all of these were clearly within the prior art. If in fact they, or any one of them, is within the prior art, and they are equivalents, there is no invention in the substitution of one for any other.

Since so much emphasis is now placed by plaintiffs upon the "etched foil technique" in conjunction with "printing", "circuit assemblages", printing on both sides, or folding or superimposing; and negative resists and electro-deposition and transfer, it will be the court's particular endeavor to point them out as they may appear in the prior art. In this connection it must be remembered that '960 was derived from the parent application, while '697 is a division thereof, and '165 is the reissue of a division thereof. Accordingly, failure to consider prior art in connection with the prosecution of '960, even if mentioned in the prosecution of the other patents, is especially significant.

Also, although these two points will be treated in greater detail, it will be helpful (it is hoped) to give preliminary consideration to the two terms—"printing" and "foil"—as used in the Eisler patents.

Perhaps no better definition of "printing" can be given than that contended for in the '697 and '165 patents:

"Printing is defined * * * as the act of reproducing a design upon a surface by *any* process." [103]

As to "foil" the specification of '960 refers to the making of prints upon a composite material consisting of "metal foil" upon an insulating backing. The "thickness and nature of the foil" are said to depend upon the process chosen for converting the imprint of a circuit component into a circuit component. "Metallised or metal-coated paper is one material"; or "metal foil" may be coated with varnish or a "layer" of plastic; or a "metal coating" may be applied to a pre-formed sheet of insulating material.[104] Later, various methods of "metallising" are set forth.[105]

---

102. In one instance not cited of record— Stevens and Dallas—there may in fact be a flat anticipation.

103. See text to Footnote 89; emphasis supplied.

104. Column 4, lines 56–73; also verbatim in '697, column 3, lines 63–74; and in '165, column 3, line 67—column 4, line 6.

105. Column 7, line 7—column 8, line 24. This particularization of methods of

It is submitted that the conductive material may with equal blessing from the inventor be "metal foil"; or "metallised or metal coated paper" [106]; or a "metal coating." This is the inevitable consequence of the language used, and is elsewhere explicitly or implicitly recognized by Eisler.

Further, while the removal of unwanted metal is ordinarily by etching with an acid, electrolytic removal would work "equally well" [107]. In some cases the unwanted metal may be made nonconductive by "anodising." [108]

Moreover, the pattern may be stamped out from the insulating sheet.[109]

### The Prior Art.

The most significant single reference in the prior art, from the viewpoint of the court, and apparently from that of the parties to this suit [110] is Application Serial No. 184,419, of Stevens and Dallas, filed January 11, 1938,[111] (not cited of record in the prosecution of any of the patents in suit) and incorporated by reference in Stevens and Dallas Patent No. 2,219,497 [112] issued on October 29, 1940. It is urged by defendant both as anticipation (35 U.S.C. § 102) and as evidence of non-invention (35 U.S.C. § 103).

The Stevens and Dallas patent related to an electrode for use in moisture register equipment. The application No. 184,419 was directed to the "Method of Making High Frequency Test Electrodes." Plaintiffs concede [113] that Stevens and Dallas "made, and may even have sold, a few 'pulp' machines." The evidence justifies the conclusion that the electrodes of these machines were made through the drilling of pyrex glass to accommodate metal plugs to which electrical leads could be attached; the face of the disc was silvered by chemical deposition; the silvered face was printed and etched, and the etched pattern was electroplated with copper; or, alternatively, the electroplating preceded the printing and etching.

Plaintiffs contend that as neither of these methods involves the use of "foil", neither is as pertinent as Harmon or O'Connell. Of course, if the silvering of the face of the disc is metallizing, and if metallizing is the equivalent of foil, there is only a difference but no distinction. Further, in the Stevens and Dallas patent, it is stated that the metallic electrode members are exceptionally thin, leading to "members of foil-like thinness" [114], typically .001"–.002". Clearly, electroplating to reinforce, or to serve as a resist, is disclosed.

The second method of producing electrodes, for the so-called "veneer" machines, even more clearly discloses the methods claimed by Eisler. As the disclosures are so significant, more than usually extensive quotation is required. Pages 3 and 4 of the specification of Ap-

metallizing is not repeated in the specifications of '697 and '165. Note, however, that this omission is either inadvertent, or the subsequent editing was atrocious, since the specifications in both these patents later, in discussing inductances, use the same language found in '960.
"* * * After the print has been metallised in one of the ways above described * * *."
'960, column 9, lines 33–34; '697, column 6, lines 28–29; '165, column 6, lines 42–43.

106. Paper is one form of insulating material. Plastic is another. '960, column 4, line 70; and so is glass, '960, column 13, lines 46–47, 57; and also cement and plaster of Paris. '960, column 12, lines 13–14; '697, column 8, line 32.

107. '960, column 6, lines 41–42; '697, column 5, lines 5–6; '165, column 5, lines 27–28.

108. '960, column 6, lines 51–53; '697, column 5, lines 15–17; '165, column 5, lines 31–33.

109. '960, column 11, line 8; '697, column 7, lines 48–50; '165, column 9, lines 14–16.

110. Defendant devotes 66 pages (35–45, 168–223) of its 223 page Brief on Validity Issues, and plaintiffs devote 15 pages (47–61) of their 103 page Reply Brief, to this question.

111. DX 88.

112. DX 93.

113. Reply brief, page 50.

114. Column 2, line 57 et seq.

plication 184,419 refer generally to "foil-like electrodes and to extremely thin, foil-like high frequency test electrode plates". As to the method of making the electrodes, the application states (Application, pages 4–5):

"In the drawings numeral 10 designates an insulation base disc, which may be formed of some suitable high frequency insulation, e. g., a moldable plastic such as polystyrene commercialized under the trade name Victron, or of Pyrex glass. Victron is especially suitable, since its power absorbing characteristics are both low and constant. Applied to the front plane base 11 of this disc is a thin metallic coating or layer 12, typically of one to two thousandths of an inch in thickness. This coating or layer 12, which may for instance be of silver, copper or aluminum, may be chemically deposited on the surface of disc 10, or may constitute a *layer of metal foil, as copper foil*, typically from .001" to .002" in thickness, though these limits are not to be considered as limitative on the broad invention, *permanently applied* to the face of the disc. If the initial coating is produced by chemical deposition, it may later be copper or silver plated to provide a stronger or thicker layer. If a copper or other *metallic foil* is to be applied to a Victron or other plastic disc, this may be accomplished by placing the foil in a plastic mold and heating under pressure against the plastic disc. This results in a Victron disc having one *metallic coated* face, the *foil* adhering to the Victron plastic." [115]

The first method of procedure disclosed (Application, pages 7–8) is:

"According to the first method of procedure, the insulation base 10 having thin metallic coating or layer 12 is coated with a photosensitive protective material, preferably of the nature of photoengravers 're-sist'. This substance, commonly composed of albumen, ammonium bichromate and water, is applied to form a thin protective layer 25 over metallic layer 12. Any suitable photosensitive substance having the characteristics of photoengravers 'resist' may of course be used and will be understood to be included within the meaning of the term 're-sist' as here used. After layer 25 has dried, exposure to light renders it insoluble in water, whereas unexposed portions of the layer are soluble in water and are easily removed by a water treatment.

"A photographic transparency consisting of a negative of the metallic electrode finally wanted is prepared, and this may be accomplished by drawing the electrode plate in black india ink on white paper, exposing same to a sensitized film, developing and fixing. In making this negative, the areas 26a that are to correspond with electrode terminal bands 26 are extended as long as possible, as indicated in Fig. 3, where such a negative, designated at 27, is shown laid over coating 25 on base 10.

"Negative 27 is preferably prepared prior to coating of the metallic coating on disc 10 with the photosensitive 'resist'. When this photosensitive coating 25 has been applied and has had time to act properly, negative 27 is laid over it, and an exposure given to light. Of course, coating 25 is applied and negative 27 laid tightly against it in a dark room. The exposure may then be given either by means of a suitable actinic lamp or by means of sunlight. The outlines of the desired electrode elements are thus photographically delineated on the sensitized surface of the disc.

"Working again in a dark room, negative 27 is then removed and the disc washed. The unexposed

115. Emphasis supplied.

parts of coating 25 are soluble in water and are washed away, exposing metallic layer 12 in those parts, and leaving a coating of insoluble material present over those areas corresponding to the transparent parts of the negative, where a light exposure was effected. It will be understood that this remaining insoluble coating, which is substantially transparent, corresponds to the area of the finally wanted metallic electrode elements 20 and 21.

"The insulation base thus at this stage has a uniform metallic layer 12, covered on those parts of its area which are to form the final electrode elements with a coating of water insoluble material 25. This material 25 is of such a nature as to be also insoluble in nitric acid, ferric chloride or other etching solution, which is applied at this time to the surface of the disc and etches the design of the electrode plates by dissolving all of the metal not protected by the material 25. When this etching is complete, the excess nitric acid is removed by washing in water, and the electrode unit is then dried."

The application then provides for "terminal connections" to which "leads" may be connected.

A second procedure is also disclosed (Application, pages 9–10):

"An alternative procedure, omitting preparation of the photographic negative and coating with photosensitive 'resist', is as follows. The outlines of the finally desired electrode elements are delineated, either by drawing, stamping or printing, directly on metallic layer 12 in an acid resisting ink or lacquer. Ordinary printers ink may be used for this purpose. After so drawing, stamping or printing, the electrode element design on metallic coating 12, the etching resist qualities of the ink coating may be built up by dusting the wet ink surfaces with a finely powdered resin such as 'dragon's blood'. The powder sticks to the wet ink and is easily dusted from the uninked parts of the surface. The surface is finally prepared for the etching solution by heating until the powdered resin adhering to the inked surfaces is melted, forming a firmly adhering and highly resistant covering on those parts of the metallic surface forming the electrode elements. The electrode design may also be drawn with a ruling pen directly on the metallic layer 12 using an acid resistant lacquer such as shellac. In this case, drying or setting of the lacquer resist is all that is required to prepare the surface for etching. Etching is accomplished by placing in a suitable etching solution such as ferric chloride, if the metallic surface is copper, or dilute nitric acid if it is zinc or silver. The electrode is then completed by inserting terminal bands 26 through holes 32 and fastening on the back face of disc 10, as before."

There is then the full disclosure of printing and etching chemically deposited metal,—a "coating or layer"—or a layer of "metal foil". Production of the pattern by photomechanical means, or by drawing, stamping or printing directly on the metal, is also clearly disclosed.

When asked to compare these process steps with Bassist [116] or Kaufman [117], defendant's expert without objection replied that they were the same. Asked to compare them with the printing and etching steps found in '960, he again replied, without objection:

"They are the same. However, Stevens and Dallas go into more detail and are more complete in the description of the etching process and

116. United States Patent 1,525,531, issued February 10, 1925 to Ellis Bassist, on application filed February 17, 1922 for

"Halftone Plate and Process of Producing Same."

117. British Patent 10,757.

in the resist application techniques."[118]

With this appraisal the court unqualifiedly agrees.

Defendant sought to establish the actual sales of "veneer machines" with electrodes of the type above described. Were it simply a matter of preponderance of the evidence, the court would rule that defendant had succeeded. However, the court does not feel that the evidence *quite* measures up to the proof beyond a reasonable doubt required to establish proof of prior use. Mumm v. Jacob E. Decker & Sons, 1937, 301 U.S. 168, 171, 57 S.Ct. 675, 81 L.Ed. 983; Colgate-Palmolive Company v. Carter Products, Inc., 4 Cir., 1956, 230 F.2d 855, 861; cert. den. 1956, 352 U.S. 843, 77 S.Ct. 43, 1 L. Ed.2d 59, reh. den. 1956, 352 U.S. 913, 77 S.Ct. 152, 1 L.Ed.2d 120; Hoeltke v. C. M. Kemp Mfg. Co., 4 Cir., 1936, 80 F.2d 912, 923, cert. den. 1936, 298 U.S. 673, 56 S.Ct. 938, 80 L.Ed. 1395.[119]

Plaintiffs further attack the weight to be given the application on two additional grounds. First, they assert that it was a mere "paper patent," never actually reduced to practice. That the application was practical was established by testimony that working from the Dallas notes of the developments leading to the application, there has been commercial production of printed circuits, both from the etching of chemically deposited film and etched foil.[120]

A short and conclusive answer to the contention that Stevens and Dallas in their application did not disclose a workable commercial process, despite the greater depth of method disclosure than Eisler, is that in that event, '960 likewise is not workable.

Secondly, plaintiffs argue that the abandonment of the Stevens and Dallas application by the financial backers of Stevens and Dallas is significant. The stated reason was:

"Authority from Dillon Stevens [not one of the applicants] by telephone after conversation with Morris Pendleton to drop this case *inasmuch as claims which apparently could be obtained would be of small value* and it was considered best to maintain the subject matter a secret. F. J. L"[121]

So far as the argument relates to the last clause of this quotation, plaintiffs have a strong point in claiming that keeping the subject matter secret is inconsistent with public use. The inability to secure the allowance of valuable claims would, however, indicate that the application was but a small advance over the then known art. Such was in fact the position of the Examiner.

Eight claims were filed. Claims 1–3 and 8, claimed the method of producing an electrode by forming a thin *metallic layer*, or depositing a *metallic coating*, or applying a *metallic foil*, to an insulating block, delineating electrode elements, and removing the metallic layer, coating or foil outside the boundaries of the delineated electrode elements. Claim 4 related to the delineation of a pair of terminal members. Claim 5 related to removal by etching. Claim 6 related to placing an insoluble protective coating over the delineated electrode elements, and etching the metal outside the boundaries of the delineated electrodes. Claim 7 was for the production of electrodes by the use of a photosensitive resist, the exposure of a photographic neg-

---

118. Transcript, page 3353.

119. Defendant did not produce, or account for the failure to produce, log books on production of machines, which might have contained critical material on the types of electrodes in the various machines. Only a few repair cards were offered, and one witness identified as having knowledge as to the manner in which records were kept, was not deposed, although apparently available. One apparently extant machine was not produced or its absence adequately explained, and no witness who had used it was called.

120. McBrayer depositions, pages 9–10, 34–35.

121. F. J. Lilly deposition, page 15. Emphasis supplied.

ative, and washing away the unexposed parts of the photosensitive coating.[122]

The Examiner's rejection was concise: [123]

"References made of record:

| Bassist | 1,525,531 | Feb. | 10, 1925 | 95–5.7 |
| Reynolds | 2,003,494 | June | 14, 1935 | 154–2 |
| Novotny | 1,377,502 | May | 10, 1921 | 154–54.5 |
| Heidenhain | 1,877,310 | Sept. | 13, 1932 | 95–81 |
| Colbert | 1,802.168 | Apr. | 21, 1931 | 95–5x |
| Miller | 1,804,021 | May | 5, 1931 | 95–5x |

"Page 6, line 23, and page 11, line 27, should be completed.

"Claims 1 to 8 are rejected as being unpatentable over Bassist. The final design of the copper layer of the patent is the full equivalent of the design of the claims insofar as the method steps are concerned.

"Claims 1 to 8 are further rejected as being unpatentable over Bassist in view of Heidenhain, Colbert or Miller, and further over said patents in view of either Reynolds or Novotny. Heindenhain, Colbert, and Miller show the specific albumen-bichromate resist and analogous processes of producing various designs in the metal layer. Miller may use the design as an electrode. Reynolds and Novotny show the softening of the plastic by heating before applying the metal foil."

*None* of the references made of record was cited of record in the prosecution of the '960 and '165 patents, and only Miller was cited of record in the '697 file.

In seeking a reconsideration of claims 1, 4, 6 and 8, applicants used arguments along the same lines as those later advanced by Eisler. They objected to rejection on photo engraving art, arguing: [124]

"The obvious and previously employed method of making electrodes of the type in question is to form the electrode members in the shape required, and then mount them individually, at the required spacing distance, on an insulation block. Obviously, such a method requires that the metal be of a substantial thickness, such that the formed electrode elements can be handled without tearing, and in any event, an electrode arrangement of exceedingly high dimensional accuracy, such as will produce a field of the desired uniformity, would be exceedingly difficult of production by such a method. Applicants' claims 1 and 8 are directed to a process which enables the electrode elements to be made of very thin material, such as of foil-like characteristics, and enables the critical dimensions of the electrode elements, such as width and gap width, to be very highly accurate. As defined in claims 1 and 8, this method consists of first applying a thin adhering metallic layer to a plane face of the insulation block, then delineating or marking out on said layer the electrode structure wanted (and this may be done in several ways, illustrations of which are given in the specification), and finally removing the metallic layer surrounding the boundaries of the delineated electrode structure. It is believed obvious that by attacking the problem in this manner, employing, incidently,

122. The defective nature of this claim, and the Examiner's recognition thereof, will be mentioned in connection with Claim 5 of '697.

123. DX 93, page 17.

124. DX 93, pages 20–21.

certain photo engraver's technique, electrode units of very high dimensional accuracy and of the required electrical characteristics may be produced. The method of producing these electrodes of exceedingly high dimensional accuracy as thus taught by applicants is a contribution of real merit and value, and since it would not appear to be at all obvious to attack the problem in the manner covered by the claims it is believed the claims should be found allowable."

Emphasis was placed by Stevens and Dallas upon the formation of terminal members, and upon the use of "a succession of steps, which constitute applicants' method for producing electrode units. The claims are not for results, but for steps of the process."[125] The delineation of the electrode elements could be done "photographically by use of a negative, it may be done by a rubber stamping process, etc."

It was further forcefully argued that the process differed from the usual method of forming the elements and then mounting them at proper relations. Specifically:[126]

"* * * The next step covered by the claim is removing the metallic layer outside the boundaries of said delineated electrode elements. The claim is for a combination of these three steps, and is not for a result, but for the method which consists in employing these three steps successively. As mentioned above, the claim is drawn to distinguish applicants' process from the usual method of first forming the two electrode elements individually, and then mounting them on the insulation block at the proper spacing distance. The claim thus is intended to cover the process which includes first applying an adhering metallic layer on the block, then marking out the uniformly spaced electrode elements on said layer, and then removing the metallic layer outside the boundaries of the marked out electrode elements. As stated above this is not a claim for a result, but for a series of steps to accomplish a result. The same applies to the other claims standing in the application."

The response of the Examiner in Office Action of March 22, 1939 was as follows:[127]

"Additional references:

| | | | |
|---|---|---|---|
| Strab et al | 2,138,892 | Dec. 6, 1938 | 175–41.09 |
| Seymour | 1,647,474 | Nov. 1, 1927 | 175–41 uxr |

"Claims 1, 6 and 8 are rejected as unpatentable over Bassist in view of Strab et al, Seymour, or Miller. Bassist discloses the process claimed by applicant but does not make electrodes for electrical apparatus by this process. However, it is old in the art to make electrodes by depositing metal on an insulating support as taught by Strab et al or Seymour. Strab et al removes a portion of the deposited metal. Miller also uses the material 3 as an electrode and provides a connection at terminals 8. Therefore, nothing patentable is seen in making electrodes by the process taught in the Bassist patent.

"Claim 4 appears allowable."

Strab is not made of record in the prosecution of any of the three patents in suit. Seymour is of record in '960 and '165.

125. DX 93, page 22.

126. DX 93, page 23.

127. DX 93, page 25.

The Stevens and Dallas application relates to the making of an electrical device, which in operation is part of an electric circuit. The electrodes are made from metal of foil characteristics—a coating or layer which may be formed by chemical deposition strengthened by plating, or by adhering foil, to an insulating disc. The pattern may be formed by photomechanical means with a "resist", or the outlines may be delineated either by drawing, stamping or printing directly on the metal, or by use of a ruling pen. In either event, the unwanted metal is removed. Provision is made for terminals. Obviously, the electrodes are to be connected to another element or elements; and to operate, there must be a difference in operating potentials.

To the court the Stevens and Dallas application seems to be a complete anticipation under 35 U.S.C. § 102(b) in that the alleged Eisler inventions were described in such application, more than a year prior to the date of the application for any of the Eisler patents. Having been referred to by Stevens and Dallas in the specifications in Patent No. 2,219,-497, the application became part of the disclosure set out in said patent (Application of Heritage, C.C.P.A.1950, 182 F.2d 639, 643, 37 CCPA 1109; B. F. Goodrich Co. v. United States Rubber Co., D.C.D.Md.1956, 147 F.Supp. 40, 58, affirmed 4 Cir., 1957, 244 F.2d 468, 470).

Should another court find that the alleged Eisler inventions were not identically disclosed or described in the Stevens and Dallas application, this court unhesitatingly finds and holds that "the differences between the subject matter sought to be patented and the prior art" were "such that the subject matter as a whole would have been obvious at the time the [alleged] invention[s] [were]

made to a person having ordinary skill in the art to which said subject matter pertains" (35 U.S.C. § 103). The court holds that the Stevens and Dallas application—not considered by the Examiner—of itself invalidates the Eisler patents, either as an anticipation, or as showing lack of novelty.

Even apart from the Stevens and Dallas application the court holds that the other prior art, cited and uncited by the Examiner conclusively shows lack of novelty.

Bassist [128], cited by the Examiner in the Stevens and Dallas application, but not by the Examiner in the Eisler prosecutions, discloses the use of a transparent insulating plate on which a thin metallic covering is provided, either by electrochemical deposition "or as a sheet thereof glued thereto." [129] Over this is provided a sensitized emulsion used by photo-engravers. The plate so prepared is exposed to a suitable halftone positive or negative, then washed in water, dissolving and removing the unexposed areas of the sensitized emulsion. The remaining portions are thereby fixed, and hardened by exposure to heat, and the plate is then etched and cut through [130] to the transparent base, outlining the design on the base. From this a finished negative or positive was secured suitable for direct reproduction from which final lithographic plates are made. In this way a number of intricate and highly technical steps were said to be eliminated, as well as a number of plates.

Plaintiffs' main non-expert witness and defendant's expert testified that the process steps of Bassist and Eisler are identical.[131]

Miller, previously cited in footnote 63, was cited by the Examiner in the Stevens

128. United States Patent 1,525,531. See footnote 116.

129. Bassist, page 1, line 58.

130. "* * * etching solution, which will cut thru to the transparent base 10 and outline the design on the transparent bed or support."

Bassist, page 1, lines 88–91.
This effectively disposes of plaintiffs' efforts at the trial to discredit Bassist by claiming that it did not teach etching all the way through the undesired metal.

131. Transcript 1609–1611; 3325–3327.

and Dallas application, with the remark: "Miller may use the design as an electrode." Miller is cited of record in the Eisler prosecutions here involved only as to '697, long after '960 had issued.

Defendant relies upon a series of early British patents, only one of which (Littledale) is cited of record in the Eisler prosecutions (in '165). This reliance is three-fold—in connection with Eisler's recognition in the prosecution of British patents of the state of the art; as to the meaning of "printing" and "foil"; and as to the state of the art known to Eisler after the British Examiner's action in 1946, but never expressly brought to the attention of the United States Examiner (so far as the record discloses; and no contention to the contrary is made by plaintiffs).

Pilkington [132] like one example in the Eisler specification, discloses a method for the preparation of electrical resistances for heaters. A strip is or strips are formed, consisting of a layer of metal chemically deposited on glass and a further layer or layers of metal deposited electrolytically on the first layer, with terminals at the ends of the strips. The pattern, on either or both sides of the glass, may be formed on the glass "by covering with a resist by known photographic processes where metal is not to be deposited." [133] Alternatively, the metal may be deposited over the whole of the glass surface and portions removed, e. g. by acid, to leave the desired form. If strips are deposited on both sides, they may be connected either in series or in parallel.

Pilkington discloses production of a resistance, necessarily requiring a difference in potentials, and a component of an electrical circuit. The photomechanical method is used to print the design; it discloses a negative resist, and deposition on the unprotected areas, or the covering of the glass with metal, the printing of a positive resist, and removal of the unprotected areas, as by etching; and the addition of extra metal on the pattern. Also disclosed are designs on both sides of the glass; interconnection; and terminals.

Demonstration at defendant's laboratory proved that Pilkington is operative in the production of a resistance element. In fact, using the Pilkington process, with modifications of various degrees of obviousness, an operating radio printed circuit board was made. The time, effort and care required would, however, make such a product of doubtful economic acceptance..

Whilems [134] sought to provide a rapid and reliable method of producing a mosaic screen, in which the shape of the elements and the pattern would be predetermined. To an insulating sheet is disposed a "metal plate". The sheet may be "coated by any suitable method, such for example as a chemical method, by evaporation or by sputtering * *" or "covered * * * by any suitable method."

The method

" * * * includes the steps of forming by photomechanical means, either directly or indirectly on the sheet of insulating material a *resist which serves* during a subsequent step, *to prevent the transfer of metal to, or the removal of metal from,* the parts of the sheet covered by the resist and thereafter removing the resist." [135]

Plaintiffs argue that a mosaic screen has only one terminal and is not a component of an electric circuit.[136] Defend-

132. DX 23; British Patent 461,275, complete specification accepted February 15, 1937 on application filed August 15, 1935, for "Improved Electric Heating Apparatus and Method of Making It."

133. DX 23, page 2, lines 26–29.

134. DX 22; British Patent 454,937, complete specification accepted October 8, 1936 on application filed April 8, 1935 for "Improvements in or relating to Mosaic Screens for Cathode Ray Tubes."

135. DX 22, page 3, lines 32–40; emphasis supplied.

136. Transcript, pages 864–865.

---

ant contends that each metallic globule constitutes a separate photoelectric element which is electrically connected to the signal plate by its capacitance to that electrode.[137]

The court finds the defendant's position more persuasive. In addition, Whilems discloses a photo-etch method that could be employed for elements having several terminals.

Littledale [138] relates to "processes for the manufacture of electric inductance coils, frame aerials and the like for use in radio apparatus, for example in radio receivers." [139] One of the merits claimed was "Cheapness and simplicity of manufacture."

Sheet metal or "metal foil" was coated with an acid-proof varnish and adhered to a backing which may be flexible, followed by "marking out the desired configuration of the coil or other device on the sheet by means of a needle, cutter, stamp or other scribing or cutting tool and etching out the marked portions by means of an acid bath * * *." [140]

As applied to a "pancake" aerial, a sheet of "copper foil" is called for, which is backed. The face is coated with Brunswick black and then a thin acid-proof coat of varnish is applied. "The sheet now prepared is mounted in a turntable or lathe and a shallow spiral cut made in the face by a needle or cutter, the copper being thus exposed at the cut." [141] The exposed copper is etched away.

In case of a transformer, double spirals are cut. By cutting more than two spirals and suitably connecting up the free needs, any desired ratio between primary and secondary can be obtained.

Near the end of the specification, it is stated that:

"The coil or other device may easily, if desired, be transferred to another backing." [142]

This rather cryptic statement is, however, just as revealing, (or unrevealing) as the Eisler specification in '960:

"Where on account of the process of development adopted, or on account of the nature of the fabric which is to form the permanent base of the conductor, it is inconvenient to make the imprint on the permanent base, it may be made on a temporary base, which must be removable, and the development process be followed by a transfer process akin to those known in the printing art." [143]

The similarities of disclosures in Littledale and Eisler are striking. The end result, in the production of the inductance shown as Fig. 7 of the Eisler specification, is identical, as demonstrated in inter partes tests, attended by the court.

Each is directed to the manufacture of a "component" (a pancake inductance) of an electrical circuit.

Each discloses the use of metal foil—of copper.

Since both devices are identical, if the Eisler one is characterized by "at least one conductor linking at least two terminals of said electric circuit of different operating potentials and including metallic joints for at least one other electrical device not contained within the component", so is Littledale.

Each provides a sheet of metal foil with an impervious insulating backing

137. Handbook of Electrical Engineers, pages 15–08.

138. DX 20; British Patent 327,356, complete specification accepted April 3, 1930 on application filed July 6, 1929 for "Improvements in and relating to Electrical Inductances and Transformers." Of record in the United States Patent Office in the later prosecution of '165, but not of record in '960 or '697.

139. Littledale, page 2, lines 78–82.

140. Littledale, page 3, line 16; lines 20–25.

141. Littledale, page 3, lines 59–65.

142. Littledale, page 3, lines 128–129.

143. Column 2, lines 16–24. Similar references to "transfer" also appear in column 6, lines 44–48; column 6, line 75—column 7, line 3; column 8, lines 34–46; and finally, with the bare reference that "The imprint is then transferred to a permanent support of glass * * *." Column 13, lines 46–48.

and "prints" [144] a representation of the conductive pattern of the inductance upon the surface of the metal foil. If in Eisler this provides "junction points" which register with "metallic joints," so does Littledale.

Each uses a resist medium adherent to the foil and protecting the pattern from etchant attack.

Each uses an etchant to remove unwanted metal.

Each requires the making of electric connections in order that they be operated as inductances.

Each employs methods easily and completely reproducible.

Each calls for covering the entire pattern area with a resist.

The only difference is the manner in which the undesired resist (the negative pattern) is removed. In the photo resist method, that material is not hardened, and is washed away. In Littledale, it is scraped away. One is hydraulic, the other mechanical. [145]

O'Connell, 2,288,735, issued July 7, 1942, for a Method of Making Electrostatic Shields, was not of record in the '960 prosecution. Although primarily directed toward the making of an electrostatic shield to intercept certain waves not helpful in radio reception, and to eliminate or materially reduce static, the specification states that the device taught "appears to be also useful as a substitute for the usual aerial or antenna * * *[146]

The method disclosed was intended to eliminate "large multitudinous strands of wires soldered together, and, therefore, causing a very large expense in the manufacture thereof." [147]

The basic material used was cardboard, Masonite, laminated paper or any suitable non-conductor. "Metal foil", preferably "aluminum foil" is used, to which, under one method, an adhesive is spread and allowed to dry. The foil is placed with its adhesive side to the non-conductor, and a brass die of contour conforming to the parallel and horizontal strips is applied to the foil, causing the glue to melt and the foil to adhere along the lines of the strips. A steel cutting die is used to cut out the foil and the strips.

An alternative method is disclosed: [148]

"The second method which I attempted might be called a chemical, as distinguished from a metallic method. In this method the gum would be applied to the back side of the foil sheet and the parallel vertical lines would be printed on the sheet gummed against the cardboard with ink impervious to acid. This cardboard with the foil attached would be dipped in an acid tank and the acid would tend to eat away the foil except where it was covered with the acid resisting ink which would tend to loosen the upright, vertical lines, and the foil occupying the space between the upright lines would tend to disintegrate and wash away. Then the ink would be removed from the upright strips of the foil by means of benzine, or even with plain water. This method also produced a successful and satisfactory device, but it is more expensive and obviously involves a messy operation and is not as desirable as the method herein setforth and claimed."

During the prosecution of the '165 claims Eisler sought to limit O'Connell to a device having a single terminal through which current did not flow; and in an effort to distinguish O'Connell, Eisler inserted the limitation in his claims that the "component" include "at least

---

144. "The act of reproducing a design upon a surface by any process."

145. Baynes, United States Patent 468,591, DX 505, recites that a resist need not be light sensitive. An acid-resist may be used in connection with a stencil, the exposed portion of the resist being removed by abrasion or by a solvent. (Page 1, lines 61–69).

146. DX 322, page 2, column 2, lines 16–18.

147. Ibid., page 1, column 1, lines 19–22.

148. Ibid., page 2, column 1, lines 63—column 2, line 8.

one conductor linking at least two terminals of said electric circuit of different operating potentials."

The attempted limitation of O'Connell to a single terminal, with no different potentials, is unjustified.

(a) The trapped waves must go somewhere. They cannot simply store up on the shield.

(b) Figure 1 of O'Connell shows, and the specification [149] specifically refers to, a wire for grounding the device. If there is a difference of potential between the air and earth ends of a lightning rod, there is also this difference in potential in the electrostatic shield.

(c) Certainly if, as O'Connell claims, the method disclosed can be useful as an aerial or antenna, there must be a conductor linking at least two terminals of an electric circuit of different operating potentials.

(d) At the trial it was demonstrated that in a device constructed by the print and etch method in accordance with Figure 2 of O'Connell, current from a battery could be passed and light a bulb; and that when a shield such as disclosed by O'Connell was energized by an electric field, the current flowing to ground would light an electric bulb.

(e) Defendant's expert testified that the O'Connell process was identical with that of Eisler's coil, No. 31 in Figure 7, usable in the antenna circuit of a radio.

Russian Patent 59,791 (1941) to Abramson and Kabakova [150] and the Article published by them in 1940 [151] disclose a process for the metallization of a plastic material to simplify and lower the cost of the assembly of various circuits and the manufacture of electrotechnical articles. One advantage claimed was the saving of "nonferrous metal foil in the manufacture of various types of screens." [152]

Copper was chemically deposited on the insulator, the design was applied to the copper in the form of a resist; the uncovered portion was etched away by acid; the resist was then removed, and the copper pattern reinforced by a galvanic coating.

The article states that the process was tested on radio equipment and consumer goods with satisfactory results.

This patent and article disclose a method for manufacturing a component of an electric circuit, and as a connecting network, would include at least one conductor linking at least two terminals of different operating potential; and if a part of a radio chassis, it would include metallic joints for other electrical devices; e. g. tubes, resistances, capacitors.

With respect to the two-sided boards, or boards superposed, and the making of crossing connections, attention is again directed to Pilkington, where strips may be deposited on both sides of an insulating sheet, and connected either in series or in parallel. Since the conductive strips may be deposited in any desired form, such as a zig-zag or ornamental pattern, the designs on opposite sides may cross.

Jansen French Patent [153] is directed to a process for procedure for insulation of current conductors in electric apparatus, and wiring panel obtained by the process. On an insulating panel conductive metallic bands are placed in grooves on one or both faces by metal casting or molding, by a galvanic process, or some such procedure. Holes can be drilled to connect the conductors on the two sides. The crossing of wiring layouts on the two sides is specifically disclosed.[154]

While the use of grooves to outline the pathways of the conductive bands is em-

149. Ibid. page 1, column 2, lines 20–21.

150. DX 509–A and 509–B.

151. DX 510–A, B and C.

152. There is the inescapable inference that "nonferrous metal foil" was currently in use for the same purpose, otherwise it could not be saved.

153. No. 788,293, 1935, DX 513 A.

154. DX 513–A, pages 3–4; See also United States Patent 2,427,144, Jansen 1947, DX 514, and British Patent 453,428, Jansen 1936, DX 515.

phasized, it is also taught that conductive tracks can be put upon the surface of the plastic insulating panel "with the help of a metal casting process or some other known procedure." Printing and etching was old in the graphic arts, on which Eisler relied. Printing and etching for electric circuitry was also old in the art of electrical circuitry before Eisler; e. g. Pilkington; Whilems; Littledale; Stevens and Dallas; and the Russian Article and Patent.

That Jansen was not a mere paper process was established by the uncontradicted testimony that it is currently in successful commercial operation.[155]

Zwick German Patent [156], not cited of record in the prosecution of the patents in suit, is a patent for a process for making electrical connections on switchboards. The process called for the sticking on of metal foil to an insulating base, the punching of holes for the reception of clamping screws, sockets and other connections, and the cutting out and removal of unwanted foil. The covering of both sides of the insulating plate with foil, and the changing over from side to side, was said to make possible the most complicated circuits. Absolute accuracy, and mass production by the use of unskilled labor, were asserted as advantages of the method.

Defendant's expert testified [157] that the final product [158] is identical with that of Eisler '960; that the illustration of the German patent is comparable with Eisler Figures 3 and 4 [159]; and the difference in processes is that Zwick removes the excess foil mechanically, while Eisler emphasizes (but does not restrict his disclosures to) removal by etching.

Zwick, like Eisler (or vice versa) teaches reproducibility, crossing connections, and connecting tracks on opposite sides of an insulating panel through the insulation; and the formation of conductors by a subtractive process.

Paragon British Patent [160], not cited of record in the prosecution of the three patents in suit, was directed toward the simplification and facilitation of the mass production of wireless and other electrical apparatus. Connections between sockets or plugs are cut or stamped out from sheet metal "such as metal foil or the like" and incorporated in the panel by being pressed into the insulating material before vulcanization, with preformed receptacles; or if crossing connections were necessary, they could be placed between outer insulating boards, and a third center insulating panel.

Instead of cutting or stamping, a stencil could be applied to a panel, and metal sprayed upon the panel or deposited thereon by electrodeposition or electrotyping; or the connections may be "produced in any other suitable manner."

As to the transfer claims, as has been previously noted, Eisler does not disclose specifically how the transfer is effected, but merely refers to the necessity for transfer, which is to be by a process "akin to those known in the printing art." Also, as previously noted, Littledale is just as dogmatic, and unspecific, as to process.

The substitution of a negative resist pattern or a metal for Littledale's transfer surface would not involve invention, particularly in view of the United States Patent 1,963,834 to Decker.[161] The invention comprised broadly electroplating

155. Transcript, pages 3454–3459; DX 516 A–D.

156. No. 453,473, issued 1927, DX 517 A and B.

157. Transcript, page 3463, et seq.

158. Eisler's patents are process patents; but "the proof of the pudding is in the eating."

159. The resemblance is truly striking, at the least.

160. British 267,172, complete application accepted March 11, 1927, of Paragon Rubber Manufacturing Company, Limited, on application filed September 11, 1925, for "Improvements in Wireless and other Electrical Apparatus"; DX 18.

161. Issued June 19, 1934 to Hugh L. Decker on application filed January 14, 1933 for "Method of Ornamentation." DX 407 Reference is made again to Decker under "Infringement."

a pattern onto a transfer surface, and transferring the pattern to the final surface. A negative mask was applied to the surface of the plate by lithographing or otherwise treating the plate, and electroplating onto the exposed area, preferably after a flash coating. The electoplated material is a heavy backing coating, preferably of a different and less ornamental metal than the flash coating, and has a stronger bond with the flash coating than that coating has with the plate. The electroplated deposit is then bonded to the surface to be ornamented, and preferably inlaid. The transfer is said to be easily effected, as the flash coating adheres only lightly to the plate.[162]

As to the metallic resist claims of '697, it has already been pointed out that Whilems disclosed the formation on a sheet of insulating material of "a resist which serves, during a subsequent step, to prevent the transfer of metal to, or the removal of metal from, the parts of the sheet covered by the resist * * *."

Other patents, also not cited of record in the prosecution of the patent in suit, clearly disclose the concept of the metal resist.

British Patent to Newton[163] is for a process for ornamenting metal surfaces. On a plate of polished metal is laid a layer of light-sensitive material, "capable of protecting those parts of the metal which are covered by it either from the action of an acid or a galvanic current."[164] The design is effected "in the camera, or through a negative reversed proof * *."

United States Patent to Stubbles[165] is directed to a process for ornamenting metals. After producing a negative resist pattern, nickel is deposited upon the unprotected surface, one of the purposes of which "is to serve as a resist against the action of an etching process either by fluid or electrolysis." Thereafter, having removed the resist, the plate is made the anode of an electric circuit, and the portions of the plate not covered by deposited nickel "are pitted or etched."

Defendant's expert testified[166] that the nickel was acting as a metallic resist in the sense recognized in the art; and that in Stubbles straight etching and electrochemical etching were equated.

United States Patent to McFarland[167] is directed to a process for etching and decorating metal surfaces. In addition to the conventional application of resists and plating, a further step is disclosed; the use of a metal as a plating and a resist.

United States Patent to Dejey[168] is directed to a process for engraving and etching metal. The design is transferred to plates or rollers with lithographic inks, and after washing, an electrolytic deposit of tin is made. Thereafter the lithographic ink is removed, and engraving is effected by subjecting the roller to an acid which does not attack tin, with or without an electric current.

Defendant's expert testified[169] that this was an additive metallic resist.

United States Patent to Payne[170] relates to the preparation of surfaces suitable for photo engraving or photo etching. For converting a negative image into a positive image, or vice versa, metal is deposited on the plate with or without an electric current, the metal being one not

162. This suggests certain advantages over the use of relatively thick foil as the "mask", with the attendant problems of removal.

163. 1835/1857, DX 501.

164. This prevents etching, or electro-deposition.

165. 584,531, issued 1897, DX 499.

166. Perhaps unnecessarily, Transcript, page 3322.

167. 1,750,418, issued March 11, 1930 on application filed December 5, 1928, for "Etching and Decorating Metal Surfaces." DX 500.

168. No. 797,668, issued August 22, 1905 on application filed August 3, 1904, for "Process of Engraving and Etching Metal." DX 507.

169. Transcript, page 3340.

170. No. 992,898, issued May 23, 1911 on application filed March 5, 1909 for "Preparation of Surfaces Suitable for Photo Engraving or Photo Etching." DX 508.

affected by the etching solution to be used, and so protecting the metal plate where it is deposited, the gelatin or substratum resist preventing the deposit of the metal on the unexposed areas. When a suitable thickness of "metal resist" [171] has been deposited on the plate, the gelatin or substratum resist is removed leaving the "metal resist" [172] on the plate, which is then etched in the usual manner.

Defendant's expert testified [173] without objection that the Eisler disclosure in the '960 patent [174] described the same metallic resist process found in Stubbles, Dejey and Payne.

### Foil.

■ Although seeking to avoid the pitching of the Eisler invention merely upon the etching of foil, plaintiffs insist that the use of an etched foil technique is an *essential* and vitalizing part of the Eisler inventions. While properly insisting that a patentee may be his own lexicographer (Dennis v. Pitner, 7 Cir., 1939, 106 F.2d 142, 148; Colgate-Palmolive-Peet Co. v. Lever Bros. Co., 7 Cir., 1937, 90 F.2d 178, 196) plaintiffs rely heavily upon their interpretation of dictionary definitions of foil. It is the opinion of the court that dictionary definitions do not require the limited interpretation sought by plaintiffs; that Eisler clearly equated foil with "layers" of metal; and that in any event, the use of "foil" in the restricted sense for which plaintiffs now contend is clearly disclosed in the prior art.

In general, the definition of foil urged by plaintiffs is a sheet of metal having a sufficient thickness to maintain integrity as a sheet; and hence susceptible of having its electrical properties tested in advance of use. Plaintiffs insist that metal deposited *in situ* cannot be and is not foil. Certain incongruities clearly arise.

The etymological derivation of "foil" from which plaintiffs derive most comfort is from the Latin, Old French and Middle English words meaning "leaf". In application, this leaf was (until the time of Thomas Alva Edison) obtained by hammering or beating metal into thin "leaves". The preponderant, and more satisfactory origin of foil as used in printed circuitry, is obtained by electrolytic deposition. The further anomaly is that plaintiffs insist that the parent of "foil"—copper electrolytically deposited upon a lead drum—is not then foil; but that immediately upon being peeled off, it becomes foil. No metal, plaintiffs argue, deposited in situ, whether deposited upon an insulating base (such as glass), or upon a conductive base, such as a different metal, is foil; but such deposited metal, upon being removed, and reaffixed to an insulating base, is foil. Such excursions into semantics are interesting and stimulating, but not persuasive. Metal deposited in situ on an insulating base, or "foil" bonded to an insulating base, will each embody its electrical characteristics, and will react to etchants, without regard to pride of origin.

Problems of bonding of course occur. This was and is true as to metal deposited in situ; although in the transfer process this may be a virtue rather than a defect. Problems of bonding with respect to foil, even as defined by Eisler, were recognized by him. They were greater as to the true, or "beaten or hammered" foil, but were significant as to deposited foil; and although American ingenuity has enormously improved bonding qualities in the past ten years, there is still wide room for improvement.

At the risk of repetition it must again be noted that Eisler does not claim to have invented "foil", or the methods for effectively bonding foil to insulating materials.

---

171. Ibid., page 3, line 51. The words "metal resist" are in quotation marks in the original.

172. Ibid., page 3, line 55. The words "metal resist" are in quotation marks in the original.

173. Transcript, page 3483.

174. Column 6, line 61—column 7, line 6.

The arguments of plaintiffs with respect to foil are not convincing.

(a) Plaintiffs quote the "pertinent" definitions of foil from Webster, New International Dictionary:

"2. A leaf, as gold, or tin foil."

"3. A thin *coat* of tin or silver laid on the back of a looking glass to cause reflection; also *paper covered with* aluminum, tin, copper, or zinc powder." (Emphasis supplied.)

(b) One of plaintiffs' witnesses testified that if copper were deposited on a surface by electroplating, built up to the thickness of deposit on a drum, and peeled off, it would be foil.[175]

One of defendant's witnesses testified that an evaporated metal coating one thousandths of an inch thick would be foil.[176] Another said that he had made foil by "rolling, electroplating, chemical reduction, vaporization;" and that he had made foil by chemical deposition and stripping, and had used it in printed circuitry.[177]

(c) In a communication from an attorney of plaintiffs with respect to alleged infringement, it was stated that foil as used in the Eisler patents was "not restricted to any specific type of manufacture of foil." The Webster definition was adopted that metal foil had "a very broad meaning and includes for instance a backing on a mirror * * *."[178] As late as January 19, 1956 plaintiffs through their attorney again, or still, contended that foil might be deposited by any one of several known and used methods, "such as spraying or precipitating"; and that "where a very thin layer is desired, it has long been customary to deposit the layer directly on the support."[179]

(d) Most persuasive, however, is the inventor's own interpretation[180] in the specifications in the three patents in suit, and in claims 15 and 16 of '697.

(1) In the specifications of all three patents in suit, in referring to metal foil, it is stated that "Metallized or metal-coated paper is one material * * *. Or metal foil may be coated with varnish or with a layer of plastic of the desired thickness. Or a metal coating may be applied to a preformed sheet of insulating material, such as plastic * * *," ('960, column 4, lines 56–73). Similar recitals are also found verbatim in '697, column 3, line 67–column 4, line 6. In '960, substantial particularization of methods of metallizing is given, not repeated in '697 and '165, but implicitly incorporated.[181]

Only one of two possible conclusions, either of which is fatal to plaintiffs' position, can be drawn. Either metallized paper and metal coatings are foil; or they are the equivalent of foil.

(2) In the prosecution of the '697 patent, plaintiffs sought to distinguish that

175. Swiggett, Transcript, pages 1762–64.

176. Tuttle, Transcript, page 2080.

177. Pritikin, Transcript, page 2562, et seq.

178. DX 336; letter dated September 24, 1952.

179. DX 336; letter dated January 19, 1956.

180. The "each-patentee-his-own-lexicographer" doctrine makes difficult reliance upon other patents where "foil" may seem to be specially defined. Plaintiffs cited Caprio patent 2,205,466 for that inventor's statement that (as used by him) metallized paper is a "metallic foil having a paper backing"; page 2, column 2, lines 41–42. Defendant cites Eschingen British patent 330,677 (DX 483) that:

"A film to be *coated* with a *silver foil* is immersed into a 6 to 8% pyrogallic acid-alcohol solution, well dried, and then dipped in a bath of 2% silver nitrate. Immediately firmly adhering metallic silver is separated." (Page 1, line 97 et seq.; emphasis supplied.)

Gibbs British patent 17,827 (DX 484) refers to the application of resist to the "foil" of a mirror, the surface of the glass having first been "silvered or gilt or platinized or otherwise coated with metal." (Page 2, line 38 et seq.; page 1, line 15 et seq.)

Schoop United States Patent 1,128,-058 (DX 485) refers to the making of metal foil, by propelling molten metal by pressurized air, and impinging it upon the surface to be coated.

181. See footnote 105.

application from the '960 patent by stating that the former added the step of electro-deposition of metal. The applicant asserted the merit of this further step, saying:[182]

" * * * He has found that such electro-deposition results under certain conditions in a *more advantageous printed circuit product* than is obtained by, retaining the *original foil*."

(3) Claims 15 and 16 of '697 refer to a component involving a backed conductive pathway pattern which comprises providing on a backing "a foil in form of a metallic layer * * *". Since these claims are based upon a specification similar, as to the conductive pattern, to that of '960 and '165, all three specifications must teach that "metallic foil" and "foil in the form of a metallic layer" are either identical; or equivalents.

(4) Eisler British Patent 639,179, relating to "metallization processes"[183] contains claims for a method of producing the conductive metal portions of electric and magnetic circuits by the use of conductive metal powder with or without "consolidation"; which consolidation can be effected by spraying on finely divided molten metal; by hot galvanising; by a flux; or by use of thermosetting plastic in the "ink."

This strongly supports the above-noted specification equivalence in the United States Patents of foil and metallization produced circuitry.

(5) Eisler British Patent 639,111 relates to the "manufacture of electrical apparatus, and particularly to the production of electric and magnetic circuits and parts thereof by a process based on the printing of a representation of the conductive metal."[184]

Language verbatim with that of the specifications in the three United States Patents employing foil, or metallised or metal-coated paper, or metal coating is used.[185] Examples of the use of foil, and of metallised patterns, are given.[186]

None of the thirteen claims in 639,111 calls for the use of foil. They relate to the preparation and use of a "flexible metallic pattern."

(6) In any event, foil by name is disclosed in the prior art; e. g. Norris 2,166,367; Stevens and Dallas application; Bassist; O'Connell; Littledale; Zwick; Paragon.[187]

### Printing.

The effort by plaintiffs, both in the prosecution of the applications from which the United States Patents issued, and in the trial of the case, to restrict "printing" to the plate or photomechanical processes, and to exclude stencils, dies, scribes, etc., is unpersuasive.

(1) Plaintiffs' counsel in their Brief on Infringement[188] state:

"Dr. Eisler had conceived of a *crude form of printed circuitry* in 1936, revolving around the idea of painting lines with adhesive paint

---

182. DX 491, page 80.

183. DX 4, page 4, lines 7–8.

184. DX 2, page 2, lines 101–106.

185. DX 2, page 6, lines 44–63.

186. DX 2 —e. g., foil, page 6, lines 3; page 7, lines 89–90; metallised paper, page 7, lines 114–118; page 8, line 81; page 8, lines 96–97.

187. The superiority of performance of "foil" over "film" has yet to be demonstrated. In the transfer process, adherence lower than that of bonded foil would seem desirable; and as noted above, Eisler contended that electro-deposition might form a more desirable printed circuit product than the original foil.

Further, it is reported in the 1962 Annual Report of American Telephone and Telegraph Company, page 18, that:
" * * * Tiny 'thin film' circuits developed at Bell Laboratories require a deposit of tantalum, ten-millionths of an inch thick, on a glass base. Such circuits have a potential use in the millions in electronic switching systems. But their mass production presented a problem since the film of tantalum must be deposited in a high vacuum. Nevertheless, Western Electric engineering research has developed a machine for this process that permits continuous flow of materials into and out of a vacuum chamber."

188. Page 19, first footnote.

and sticking gold leaf to the paint * * *." (Emphasis supplied.)

(2) In his British Patent 639,111, Eisler had recognized that "Printing and analogous processes have already been proposed in the production of some electric circuit components." Examples were the production of circuit connections of a radio receiver by punching them out of foil, or by aid of a stencil by spraying metal or depositing it by electro-deposition or electrotyping; and printing with a rubber stamp in adhesive ink and sprinkling the ink with powdered metal and electroplating. He also recognized that in all but the simplest circuits there would be points where conductors crossed but were not to be connected, in which case the conductors would be formed partly on each of two panels which would be superposed; or by interrupting one of the two crossing conductors and completing it by a U link.[189] Eisler further recognized that "such methods" have been proposed for making other "electrical components" such as resistances, condensers and inductance coils; and to make a variable condenser and a variometer by gumming electrodes or coils upon an impregnated sheet of cardboard; heaters by forming a negative pattern in photoresist on glass and electrolytically depositing metal on the unprotected glass; and the printing of a pattern in resist on paper and depositing metal from vapor.[190]

(3) Claim 15 in the '697 patent, based upon disclosures no broader than those in the other two United States Patents, applies to "producing", without limitation as to means, a negative representation upon the metallic layer.

(4) As has heretofore been developed, in order to bring photomechanical production within the field of printing, Eisler sought for and obtained from the Board of Appeals of the Patent Office the broadest possible definition, that "the terms 'printing' and 'imprint' require only the reproducing of a design on a surface by *any method*." (Emphasis supplied.)

### Component.

All of the patents in suit relate to the manufacture of electric circuit "components." In early attempts to license, plaintiffs had taken the position that two parallel lines of metal could be a circuit "component." At the trial, plaintiffs' position was far from static. One of their witnesses testified that a single small band of etched copper could be a component, dependent upon its end use. During the plaintiffs' case in chief, their expert witness took a different view, asserting that a mere assemblage of tracks would not be a "component"; that to be a component the article must have electrical properties different from those incidental merely to transmission of current. It was on that testimony, and the further testimony that the specifications of the patents disclosed methods for the production of assemblages having electrical properties additional to mere transmission, that the court declined a motion by defendant for judgment in its favor at the end of plaintiffs' case; for from the prior art the court was then convinced [191] that the mere production of copper lines, which by their very nature were necessarily electrically conductive, by printing and etching did not disclose patentable novelty over the prior art.

Later this additional quality was explained by plaintiffs' expert as being really negative in nature. If parts of the circuit were too close, or became loosened or moved, interferences might be set up. The court is now satisfied and finds, that the relationship of the paths

189. DX 2, page 4, lines 15–38.

190. DX 2, page 4, lines 39–57.

191. This was not a "snap" judgment. The case had been extensively briefed before trial; the court had received well in advance of trial copies of much of the prior art, some of which had been thoroughly discussed in connection with discovery motions; and the court had seen manufacturing of products, from the very simple to the very complex, under licenses from plaintiffs.

to each other on the same side (so long as they do not contact each other and short out) is not significant; and that from a performance standpoint with respect to the devices in question, there is no performance advantage of the printed circuit over a properly wired [192] point to point circuit. Moreover, there was uncontradicted testimony on the part of defendant, which the court accepts, that after the constituents of an assemblage have been determined, the "lay out" is entirely a matter of the most convenient way of fitting them into an allotted area.

The specifications seem to adopt the broadest aspects of component. Reference is made to the principal purpose of the invention as quantity production of electric circuit components, such as "the interconnecting networks or circuit connections of radio apparatus"; [193] "the production of the metal and magnetic conductors in position"; [194] references are made to the production of the "conductor"; [195] "the several components, including the connecting network"; [196] disposing the network into two or more planes, "so making the network two or more circuit components"; [197] "the location of various components other than the network itself"; [198] "converting the imprint of the circuit component into a circuit component"; [199] "the imprint made is a positive imprint, that is to say the inked part represents the conductors of the component; and the imprint is made on metal; and the component is completed by removal of metal from the imprinted areas"; [200] "circuit compo-

nents" of a radio receiver, "namely the circuit connections"; [201] a "pattern of parallel lines" for the "production of electrical resistances" for all kinds of heaters; [202] a flat spiral inductance for an antenna circuit [203]; Claims 1 and 2 of '960: "A method of manufacturing a system of electric circuit connections * * *"; Claims 4 and 5 of '697: "A method of manufacturing the conductive metal portions of electric and magnetic circuits of the kind including a conductive pathway pattern * * *"; and Claims 1, 2, 6 and 7 of '165: "A method of manufacturing a component of an electric circuit involving a conductive pattern * * *."

Plaintiffs' expert witness admitted [204] that from the Eisler patents he did not know where to draw the line as to when a network ceased to be "just a higgly-piggly assembly of wires that make connections" and when it became a "component". Plaintiffs' main lay witness, Swiggett, although believing that as a practical matter there should not be too much trouble in drawing the line, generally testified that there would be a "very small" area of doubt.[205]

Defendant's point that the claims are void for indefiniteness is a strong one, in the light of the specifications, plaintiffs' ante litem motam correspondence, and the testimony at the trial; so strong that defendant nearly obtained judgment in its favor at the end of plaintiff's case. In view of the admonitions in Lever Bros. Co. v. Procter & Gamble Mfg. Co., 4 Cir., 1943, 139 F.2d 633, 639–641 and

---

192. "Properly wired" of course means that proper interconnections have been made and that the wires do not move when the device is being operated.

 The court reads with interest the radio and television ads in the Sunday papers, in which the same retailer will extoll the virtues of printed circuits in one set, and refer to another as "all hand wired; no short cuts."

193. '960, column 1, lines 8–10.

194. '960, column 1, lines 35–37.

195. '960, column 1, line 46; column 2, line 5.

196. '960, column 3, lines 40–41.

197. '960, column 3, lines 69–70.

198. '960, column 4, lines 5–6.

199. '960, column 4, lines 63–64.

200. '960, column 6, lines 30–34.

201. '960, column 8, lines 61, 62.

202. '960, column 11, line 74; column 12, line 1.

203. '960, column 8, line 74—column 9, line 1; Figure 7, numeral 31.

204. Transcript, page 757.

205. Transcript, pages 1692–1697.

Georgia-Pacific Corp. v. United States Plywood Corp., 2 Cir., 1958, 258 F.2d 124, 136, cert. den. 358 U.S. 884, 79 S.Ct. 124, 3 L.Ed.2d 112, the court is relieved that it is sufficient to state that the claim of indefiniteness strongly supports, if alone it would not require, the finding of invalidity.

Junction Points and Metallic Joints.

Much time was spent, and trouble taken, in an endeavor to determine the meaning of "junction points" in the '165 patent. Defendant contends that as used in the specifications they refer only to points at which the conductive tracks on opposite (or different) sides of insulation are electrically interconnected. Plaintiffs contend that the term, while embracive of such connections, is not limited thereto, but also includes points at which the lead of an external component is connected (metallic joint) to tracks on one side only of a board.[206] Eisler himself described them as "these junction points, or whatever you call it, terminal points." [207]

While of significance in tending to show indefiniteness in the claims, the choice between the two would be critical only if the claims were to be held valid, in which event, under defendant's construction, the claims of '165 could not be infringed by a single-sided board.[208] In any event, cross-connections are shown in the prior art, e. g. Pilkington, Jansen, Zwick, Paragon, Wermine; and metallic joints; e. g. Stevens and Dallas application; Littledale; Zwick; Paragon, Wermine.

Claims for Inoperative Procedures.

(a) Defendant contends that the claims of the '165 patent, and Claims 1, 2, 3 and 7 of the '960 patent, read on inoperative procedures. The claims refer to "utilizing the differentiation resulting from the imprint to produce a differentiation of conductive and non-conductive parts of the metal foil." Testimony on behalf of defendant[209] was to the effect that it is technically impossible to render metallic foil nonconductive, as metallic foil is always conductive. If unwanted foil is removed chemically or mechanically, what is left is conductive. A removal does not make, or continue, the removed foil as a "non-conductive part of the foil." Likewise, if the unwanted foil is anodized throughout its thickness, it becomes non-metallic and non-conductive; but it is not a non-conductive part of the foil, any more than the insulating base is a non-conductive part of the foil.

While it is clear from the specifications that the elimination, in some manner, of the unwanted foil is necessary, one practicing the claims of the '165 patent, and Claims 1, 2, 3 and 7 of the '960 patent, in strict conformity with their language, could not produce an operative result. For this additional reason these claims are found as a fact, and held as a matter of law, to be invalid.

(b) Claim 5 of '697 is also inoperative. The claim reads as follows:

"5. In a method of manufacturing the conductive metal portions of electric and magnetic circuits of the kind including a conductive pathway pattern upon an insulation backing, the steps of printing a negative representation of the desired pathway pattern upon a sheet of metal foil, thereupon depositing

---

206. Claims 1 and 7 of '165 seem literally to refer to an impossibility when they refer to the pattern as "including metallic joints for at least one other electrical device not contained within said component * * *." You may provide *for* the *making* of joints, metallic or otherwise, either by "lands" or other means, but you cannot "include" a joint until one has been made by the junction of two or more objects at a common point.
At the trial, plaintiffs apparently sought to interpret this language as meaning that under the Eisler process, soldered, as distinguished from pressure, "joints could be effected."

207. Eisler deposition, page 242.

208. Plaintiffs admit that a single sided board would not infringe '960.

209. Modjeska, Transcript, pages 3436–3438; Randolph, Transcript, pages 2139–2142.

metal upon an unprinted surface portion of the foil, and then transferring the metal foil to an insulating support."

■ This claim omits the essential step of removing the unwanted foil (in this case all the foil, or at least all the foil not covered by the deposited metal). Testimony was introduced that the failure to remove the copper foil or backing would be to short out the entire system [210]; an obviously correct answer. The omission of an indispensable step of a process renders a claim invalid. Aluminate Co. v. Akme Flue, Inc., D.C. Md.1931, 50 F.2d 921; Daniel Green Felt Shoe Co. v. Dolgeville Felt Shoe Co., 2 Cir., 1913, 210 F. 164; Pennsylvania Crusher Co. v. Bethlehem Steel Co., 3 Cir., 1951, 193 F.2d 445; Western States Machine Co. v. S. S. Hepworth Co., 2 Cir., 1945, 147 F.2d 345, cert den. 1945, 325 U.S. 873, 65 S.Ct. 1414, 89 L.Ed. 1991.

The last cited case is particularly pertinent, as it further holds that where other claims of the patent do recite the necessary means, these limitations will not be read into the offending claim. In '697, claims 4, 10, 14, 15 and 16 do recite the removal of the unwanted metal.

■ In holding claim 5 of '697 invalid for this additional reason, the court does not believe it is being hypertechnical. A remarkably comparable situation was similarly handled by the Examiner in the prosecution of the Stevens and Dallas Application 184,419. Original Claim 7 reads as follows: [211]

"The method of producing an electrode unit for testing materials, that includes forming a thin adhering metallic layer on one plane face of an insulation block, coating said metallic layer with photosensitive resist, placing a photographic negative of the pair of electrode elements wanted in front of said coated sur-

face and exposing to actinic light, and washing said surface to remove the unexposed parts of the photosensitive coating, leaving a pair of spaced metallic electrode elements on the face of the block."

That claim left the metallic layer intact, but with the pattern for the electrodes exposed. The Examiner made short shrift of the claim, tersely saying: [212]

"* * * In claim 7, there *is no etching step recited so that it is incomplete,* the 'leaving' phrase at the end of the claim being functional."

Double Patenting.

Defendant urges that '165 is invalid as a second patent for the same invention for which '960 was issued. A very strong case is made out by a comparison of claim 2 of '960 with Claims 1–17 of '165. It is unnecessary to take them up one by one,[213] because plaintiffs do not challenge the comparison, except as follows: [214]

"* * * The claims of patent '960 are limited to the making of superimposed pathway patterns with crossing connections but do *not* require the joining in of external components; in contradistinction to this, the claims of Patent '165 embrace single sided boards but *do* require the joining in of external connections. The last mentioned requirement was deemed by the Examiner to be the *sine qua non* of patentability in '165; supra, p. 34. It did not enter at all into the question of patentability of '960." (Emphasis in original.)

The court's reaction to this attempted distinction has previously been indicated. The specifications in '960 and '165 are identical for these considerations. In '960 reference is made to metallic junctions between the superposed part circuit components, by which "the conduc-

210. Transcript, page 1982.

211. DX 93, page 13.

212. DX 93, page 18, emphasis supplied.

213. As defendant does in its Brief on Validity, pages 18–35.

214. Reply Brief for Plaintiffs, page 73.

tors on one side are joined to conductors on the other side, and to the terminal tags of other circuit components such as the resistance 24 * * *." [215] "Or such connections may be made by wire stitching, using wire staples, or wires bent twice at right angles into S form as seen at 26 in Figure 6, and the terminal wires 27 of a component such as the fixed capacitance 28 of Figure 6 may be used for such stitching * * *." [216]

The absurdity of a two-sided board cross-connected, with which nothing else was to be connected, not even a power source, is even greater, if this be possible, than the making of forever-virgin single-sided boards. The very title of each of the three patents—"Manufacture of Electric Circuit Components"—demands that the product, made by the patented method, be connected with something else, or something else with it in order to be a "component"; it cannot be a component of a device consisting only of itself.

The point of double-patenting was raised in the prosecution of '568 (of which '165 is the reissue) and initially was upheld by the Examiner, and the claims were rejected on this ground.[217] Eisler's new attorney argued that the claims in the application were not restricted to two metallic circuits with insulation between them, through which connections are made; "the substitute claims * * * all specify an electric circuit component having electric connections for connecting [218] another electric device not an integral part of the component and which is not required by the claims of the ['960] patent." [219]

Apparently this statement, argument or explanation satisfied the Examiner, for without further Office Action the patent issued. It does not satisfy the court, even recognizing the presumption of correctness in Patent Office rulings. If the process for making double-sided boards is patentable, it certainly is not a patentable advance to make one-sided boards. In either case, the boards are useless as components unless made to be components, by being incorporated into, or connected with, other devices to become a "circuit." This is equally indispensable, whether the boards be one- or two-sided, or stacked knee deep.

■ The court holds that '165 was invalidly issued, after the issuance of '960.

### Intervening Rights and Laches.

■ Defendant contends that Claims 4 and 10–16 of the '697 patent are invalid on grounds of intervening rights and laches. These claims are directed to the metallic resist, or reverse printing, process.

Defendant's argument in brief is as follows: Original claim 4 of the '960 application was for a process similar to that of claim 4 of '697 as issued. However, original claim 4 of the '960 application was cancelled, and that patent issued with claims limited to superposed tracks on opposite sides of insulation and electrically connected therethrough. In the '568 application, no specific claim such as original claim 4 of '960 was included, although it was embraced by the "printing" recitation of the generic claim. Between November 14, 1951 and January 13, 1953, "Eisler had no claim pending directed to the *'reverse printing'* technique which did not *also* contain the step of *transfer*." [220] During this period it is claimed that processes using metallic resists were in

---

215. '960, column 5, lines 63–66.

216. '960, column 5, lines 67–72.

217. DX 489, page 86.

218. The court does not understand the use of the words "having electric connections for connecting * * *." "Having" means presently possessed of; "connections" likewise must be existent, or the component does not have them. More-

over, it would seem that a device cannot "have" electric connections unless such connections are already made. Perhaps what was meant was "containing provisions for the making of electric connections with another electric device."

219. DX 489, page 93.

220. Defendant's Brief on Validity, page 13; emphasis in original.

public use by others, under one of whom defendant claims license rights, and that on February 15, 1952 a paper [221] was published by the Signal Corps explaining the metallic resist and transfer processes. Defendant relies on cases such as General Electric Co. v. Hygrade Sylvania Corp., D.C.S.D.N.Y.1944, 61 F.Supp. 476; Stanley Works v. C. S. Mersick Co., D.C.Conn.1940, 34 F.Supp. 913; Dill Mfg. Co. v. J. W. Speaker Corp., D.C.E.D.Wis.1949, 83 F.Supp. 21, affirmed 7 Cir., 1950, 179 F.2d 278, cert. den. 1950, 340 U.S. 818, 71 S.Ct. 48, 95 L.Ed. 601, and Vitamin Technologists v. Wisconsin Alumni Research Foundation, 9 Cir., 1944, 146 F.2d 941, cert. den. 1945, 325 U.S. 876, 65 S.Ct. 1554, 89 L. Ed. 1994, reh. den. 1945, 326 U.S. 804, 66 S.Ct. 12, 90 L.Ed. 490.

Plaintiffs reply that defendant when called upon to particularize its defense of intervening rights was unable to give any instance of intervening use; that the publication relied upon was less than one year before the filing by plaintiffs of a broad claim in the '697 application; that there was no break in the continuity of Eisler's applications pending in the United States Patent Office; and that during the period November 14, 1951 to January 13, 1953, there were pending in the '697 applications claims for the step of "reverse printing", although limited to transfer; and that the defense of abandonment must be pleaded or noticed.

Plaintiffs' position is supported by Crown Cork & Seal Co. v. Ferdinand Gutmann Co., 1938, 304 U.S. 159, 165, 58 S.Ct. 842, 82 L.Ed. 1265. In that case the court pointed out that abandonment had not been pleaded as a defense, and that the disclosure of the patentee there involved was continuously before the Patent Office indicating an intent to retain, rather than abandon, the disclosed invention, even although a partic-

ular specification and the claims relating thereto had been cancelled from the original application and brought back in by a divisional application.

This defense is not available to defendant.

### Unclean Hands.

Defendant contends that in the prosecution of the various patent applications before the United States Patent Office plaintiffs were guilty of a continuing pattern of inequitable conduct. In substance the claim is based upon the "concealment" from the Examiner of pertinent art, primarily in the form of British patents; that this resulted in the issuance of the '960 patent and Reissue '165, and in the allowance of broader claims in '568 than would otherwise have been allowed.[222]

This defense, which is one of unenforceability, is immaterial if the court's conclusion as to invalidity is sound.

That fraud, inequitable conduct or bad faith in proceedings in the Patent Office may result in unenforceability of a patent is well established. Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co., 1945, 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381; Hazel-Atlas Glass Co. v. Hartford Empire Co., 1944, 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250; Keystone Driller Co. v. General Excavator Co., 1933, 290 U.S. 240, 54 S.Ct. 146, 78 L.Ed. 293; Triumph Hosiery Mills, Inc. v. Alamance Industries, Inc., D.C.M.D.N.C.1961, 191 F. Supp. 652, aff'd. 4 Cir., 1962, 299 F.2d 793, cert. den. 1962, 370 U.S. 924, 82 S.Ct. 1566, 8 L.Ed.2d 504.

There is, however, the extremely difficult question as to what constitutes inequitable conduct in the prosecution of a patent insofar as "withholding" of prior art is concerned.[223] Is there an affirmative duty to volunteer references under any circumstances? If so, is it

---

221. DX 465.

222. Pages 1–80 of defendant's brief on Unclean Hands and Misuse are devoted to an argument on the alleged facts relied

upon to support the defense. The legal argument appears at pages 81–92.

223. The court is advised that this question is the subject of active discussion at meetings of the Patent Bar.

limited to those cases only in which the solicitor knows or has reason to believe that the references in question are more pertinent than those with which the Examiner is acquainted, or must merely cumulative art also be cited? See, in addition to the above-cited cases, United States v. Standard Electric Time Co., D.C.D.Mass.1957, 155 F.Supp. 949, app. dis'm. 1 Cir., 1958, 254 F.2d 598; Admiral Corp. v. Zenith Radio Corp., 10 Cir., 1961, 296 F.2d 708.

Plaintiffs deny any bad faith; intimate that the Examiner was put on notice as to the allegedly "withheld" art; and argue that in any event such art was no more pertinent than that made of record by the Examiner.

The court considers it to be unnecessary to characterize the conduct of the prosecution of the United States Patent applications. The Pilkington, Whilems and Paragon patents have previously been discussed. If they negate novelty, they support the conclusions of invalidity; if they do not, plaintiffs' conduct, however denominated, was ineffective and therefore harmless.

Plaintiffs' licensing Policy and Practices.

Defendant vigorously attacks the validity of plaintiffs' licensing policy and practices. Although these involve questions of enforceability, not validity, and if invalid would be susceptible of correction, the issue was treated at length.[224] Defendant challenges the following alleged policies and practices: (1) License provisions which require post-expiration royalty payments; (2) In package licenses, providing that the licenses remain in force for the full life of the last-to-be issued patents; (3) Coercive "package" licensing by refusal to differentiate between individual and package royalty rates; (4) Including "know-how" in licenses; and (5) Inclusion of a "most favored nations" clause in the licenses.

An exhaustive treatment is not deemed necessary. First, the court is entirely satisfied that the patents in question are invalid. Second, if there should be a remand, it would be necessary at that time to determine existing practices, and the periods during which they were in force. Third, the court would desire to have testimony as to actual experiences of licensees, rather than depend entirely upon documentary evidence. Briefly (at least comparatively), however:

(1) License provisions requiring post expiration royalty payments.

The fourth paragraph of Article 6 of the Baldwin-Lima-Hamilton license agreement [225] is as follows (emphasis supplied):

"'It is recognized by the parties hereto that the principal patent No. 2,587,568, issued February 26, 1952, expires February 2, 1963 under Section 1, Public Law 690 of August 8, 1946 and that normally royalties under this particular patent would cease upon its expiration. However because this license involves transfer of technical information and knowhow, *Licensee agrees to pay royalty under this particular patent for a period of five (5) years after its expiration*, provided, that if at any time during this five (5) year period foil type gages or other articles licensed hereunder embodying the invention of said patent No. 2,587,568 are sold in the United States by any competitor of Licensee, then henceforth for the remainder of said (5) year period Licensee shall not be liable for payment of royalties under this particular patent and, further provided, that if Licensee is required at any time during this five (5) year period to pay royalty to any outside party who holds a patent containing a claim which covers the foil type

---

224. Defendant's Brief on Unclean Hands and Misuse, pages 93–150; Plaintiffs' Reply Brief, pages 87–102.

225. PX 191.

gage licensed hereunder, then the Licensee can deduct such outside royalties from the royalties payable to Licensor. However, the deduction of said royalties for any given year cannot exceed the amount of royalties otherwise payable to Licensor hereunder for that year and no credit for deductions can be carried over to any succeeding year.'"

This express requirement that *royalty* be paid on a patent for five years after its expiration seems to be a clear violation of established principles that the monopoly of a patent cannot be continued, even by agreement, beyond its expiration date. Motion Picture Patents Co. v. Universal Film Mfg. Co., 1917, 243 U.S. 502, 516, 37 S.Ct. 416, 61 L.Ed. 871; Scott Paper Co. v. Marcalus Mfg. Co., Inc., 1945, 326 U.S. 249, 255–258, 66 S.Ct. 101, 90 L.Ed. 47; Prestole Corp. v. Tinnerman Products, Inc., 6 Cir., 1959, 271 F.2d 146, 154, 155, cert. den. 1960, 361 U.S. 964, 80 S.Ct. 593, 4 L.Ed.2d 545; Tinnerman Products, Inc. v. George K. Garrett Co., D.C.E.D.Pa.1960, 185 F. Supp. 151, aff'd. 3 Cir., 1961, 292 F.2d 137, cert. den. 1961, 368 U.S. 833, 82 S. Ct. 58, 7 L.Ed.2d 35.

Plaintiffs try to "talk around" the issue by saying that conditions in the license agreements (absence of competition, and absence of an adversely held dominant patent) have in fact made this provision a dead letter; that if the provision is decreed to be unlawful, it will be "renounced"[226]; and that a licensor and licensee can agree upon any yardstick for payment. The court would be inclined to agree with the last contention as an abstract proposition, for presumably the payment of a flat sum, agreed upon in advance, could be spread over a number of years. But plaintiffs and Baldwin did not do that. They agreed that *royalty* should be paid under a patent for a period of five years after its expiration. This, under the authorities above cited, was improper.

(2) Package licenses terminating upon expiration of patent last issued.

The pertinent provision of the license agreements is as follows:[227]

"Article 8. Term of License Agreement. This agreement shall remain valid and in force for the full life of the Letters Patent last to be issued and embraced by this agreement unless earlier terminated as herein provided."

The validity of such a provision was questioned by the Court of Appeals for the Fourth Circuit because it "might easily lend itself to an unreasonable restraint of trade by extending patents beyond their legal limit * * *." (Baker-Cammack Hosiery Mills v. Davis Co., 4 Cir., 1950, 181 F.2d 550, 573, cert. den. 1950, 340 U.S. 824, 71 S.Ct. 58, 95 L.Ed. 605). The court found it unnecessary expressly to rule on this point as the provision had been eliminated after suit was filed, but before trial in the District Court.

Such a provision was specifically held to be invalid in American Securit Co. v. Shatterproof Glass Corp., 3 Cir., 1959, 268 F.2d 769, at page 777, cert. den. 1959, 361 U.S. 902, 80 S.Ct. 210, 4 L.Ed.2d 157, reh. den. 1960, 361 U.S. 973, 80 S.Ct. 584, 4 L.Ed.2d 553, where the court said:

"We conclude also, and quite apart from all of the foregoing, that Paragraph 8(a) of Securit's Standard Licensing Agreement which provides that that agreement shall continue 'in full force and effect until the expiration of the last to expire of any' of Securit's patents set out in 'Schedule A' constitutes a patent misuse *for it extends the payment of royalties of patents under patents which may expire to the expiration date of that patent most recently granted to Securit.* Indeed the expiration clause of the contract works an 'aggravating hardship' on the licensee as Judge Leahy stated, in that it demands the renunciation of all pat-

---

226. The court is advised that the provision in question has now been cancelled.

227. DX 184.

ents, whether wanted or unwanted under the license." (Emphasis supplied.)

This court is in accord with the Third Circuit holding.

The termination provisions permit termination in toto on any anniversary date during the first five years upon payment of royalties for the full license year for which notice is given. Thereafter the license can be terminated only at the expiration of successive five year periods, upon payment of royalties due to the end of the full five-year license period.

Plaintiffs urge that the agreements should be construed to mean that they cease to apply to any expired patent as of the date of expiration. The license agreements presently being offered contain the word "unexpired." [228] However, for the reasons to be discussed under the next heading, it is doubtful if such an interpretation would save the licenses from invalidity.

(3) The charging of the same royalty regardless of the number of patents licensed.

Plaintiffs will license the right to use one, two or all three of the patents in suit for the same royalty in either of the three eventualities. Defendant claims that this is the equivalent of "block-booking", and that there must be some differential available to licensees between a single-patent rate, and a multi-patent rate. Plaintiffs contend that the royalty rate in fact charged for the use of a single patent is fair and reasonable, and that to permit a licensee to select as many additional ones as he wishes, at the price of one, cannot be coercive. If it were true that the royalty for the use of a single patent were fair and reasonable, there would be great strength to plaintiffs' argument that the owner of multiple patents need not license each of them at less than a fair and reasonable rate, in order not to be charged with misuse.

The evidence in the case does not satisfactorily establish whether or not the royalty charged would be reasonable for a single patent. The answer to the question is further complicated by the fact that the first license was upon a rate lower than any of the others, and permitted the suspension of payments if plaintiffs did not adequately pursue alleged infringers; and at least two licenses were for lump sum amounts. Moreover, the willingness to throw in any number of patents for the same rate (the only consideration apparently being the estoppel of a licensee to contest the validity of a patent under which he is licensed) is suspect. Altruism is a virtue not usually ascribed to licensors.

While this case is not one of a refusal to license a single patent, to which the principles of United States v. Paramount Pictures, Inc., 1948, 334 U.S. 131, 157–159, 68 S.Ct. 915, 92 L.Ed. 1260 and 1955 Report of the Attorney General's National Committee to Study the Antitrust Laws, pages 239–240 would apply, the licensing practice in terms falls within the condemnation of "granting a license only under all patents at a fixed rate, or under any one patent at the same rate which is, in effect, equivalent to apportioning the fixed rate amongst all the patents and then requiring the applicant to take a license under all if he wishes to have a license under one. * * *" American Securit Co. v. Shatterproof Glass Corp., D.C.D.Del.1957, 154 F.Supp. 890, 895, affd. 3 Cir., 1959, 268 F.2d 769, 777, cert. den. 1959, 361 U.S. 902, 80 S. Ct. 210, 4 L.Ed.2d 157, reh. den. 1960, 361 U.S. 973, 80 S.Ct. 584, 4 L.Ed.2d 553; see also United States v. Loew's, Inc., D.C.S.D.N.Y.1960, 189 F.Supp. 373, 378–379, modified as to form of decree, 1962, 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11; Baker-Cammack Hosiery Mills v. Davis Co., 4 Cir., 1950, 181 F.2d 550, 572, cert. den. 1950, 340 U.S. 824, 71 S.Ct. 58, 95 L.Ed. 605.

Moreover, the option to a licensee to terminate the agreement as an entirety, but not as to any particular patent, appears inconsistent with plaintiffs' posi-

228. DX 197.

tion that the royalty for any one patent being fair, licensing of more than one for that same rate must a fortiori be fair. It strikes the court as being peculiar that after having persuaded a licensee to accept a gift, the licensee is not permitted to return the "free" portion alone but in order to rid himself of the "free" portion, he must also surrender the "paid for" portion.

Plaintiffs' policy in respect to licensing at the same royalty regardless of the number of patents used, but not permitting the surrender of less than all, would appear to be improper, but the record does not permit a final ruling.

(4) Including "know-how" in licenses.

In their efforts to obtain licensees, plaintiffs emphasized "know-how", to be thrown in as an "added inducement"; "the little bit of something that makes a difference between success and failure, no matter what's written on the paper." [229] References to know-how are contained in the recitals and first Article of the typical license agreement.[230] Considerable acrimony developed during the trial, and in the briefs after trial, as to whether or not plaintiffs had any appreciable know-how to disclose. Technograph Printed Circuits, Ltd. has only recently manufactured printed circuits on a commercial basis, and has never had any substantial laboratory facilities.

The first licensee, Photocircuits, Inc., endeavored to obtain a license which did not include know-how, but ultimately took a license, at a very low royalty rate, that did include it. Before receiving the license Swiggett, Photocircuit's chief executive officer, already knew from his own technical background how to make a printed circuit by etching a copper clad laminate. He received very little production engineering knowledge that would help him make printed circuits at a lower cost and beat competition. The

major contribution was the elimination of the necessity of certain research work in the application of resists. Early in the game little of benefit was obtained from a "production, engineering, process control point". Recently some production know-how has been obtained from the English company. All that was initially achieved "was to put at rest our minds from the patent infringement viewpoint." [231]

Plaintiffs contend they did have valuable know-how, but that as it also [232] was thrown in without additional fee, the offer to a licensee of the use of alleged know-how to induce the taking of a license was neither coercive nor a compulsory tie in. The court has not been cited to, and has not found, any case in which this particular situation has been passed upon by the courts. The general rule against the party owning a legal monopoly over an article conditioning the sale or licensing of that article upon the agreement of the other party to buy or bargain as to another product, patented or not, is well established. Pape Television Co., Inc. v. Associated Artists Production Company, 5 Cir., 1960, 279 F.2d 217, 218; Northern Pacific Railway Co. v. United States, 1958, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545.

Before reaching a final decision upon the validity of the inclusion of know-how in patent licenses, the court would need further evidence as to the actual negotiation of licenses; whether licenses could be obtained without the inclusion of know-how; if so, could they be obtained at a lower price; if not, was this the equivalent of apportioning the rate among all the patents and know-how, and requiring in effect a licensing of all? (See American Securit Co. v. Shatterproof Glass Corp., supra.)

(5) Inclusion of a "Favored Nations Clause."

229. Transcript, page 1396.

230. E.g., PX 184.

231. Transcript, pages 366–370. The witness Swiggett, although naturally interested in vindicating his judgment in de-

ciding to take a license, impressed the court as being an extremely competent and honest witness. Further reference will be made to his testimony.

232. Along with all patents issued and to issue on pending applications.

■ The license agreements contain a "Favored Nations Clause" [233] providing that should any license be granted subsequently on more favorable terms and conditions, such future license agreement may at the request of the prior licensee be substituted for his agreement. Defendant unpersuasively argues that this provision suppresses competition, and fixes and stabilizes royalty rates by permitting plaintiffs to argue that as a practical matter this provision forecloses the acceptance of a lower royalty.

The short answer is found in United States v. U. S. Gypsum Co., 1948, 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746. The court, in finding a conspiracy to violate the Sherman Act through license agreements, which contained a most favored nations clause (333 U.S. page 389, 68 S.Ct. 539) did not include that provision in its enumeration of improper provisions. Later, upon review of the final decree (340 U.S. 76, 71 S.Ct. 160, 95 L.Ed. 89) the Department of Justice insisted upon the inclusion of such a clause in the reformed license agreements and the court said (340 U.S. page 94, 71 S.Ct. 172) that the licensor "should be required to license all its patents * * * to all applicants on equal terms."

### Commercial Success.

■ Commercial success, while of some significance in a doubtful case, is immaterial if invention is lacking. Great Atlantic & Pacific Tea Company v. Supermarket Equipment Corp., 1950, 340 U.S. 147, 153, 71 S.Ct. 127, 95 L.Ed. 162; Murdock v. Murdock, 4 Cir., 1949, 176 F.2d 434; Ingersoll-Rand Co. v. Black & Decker Mfg. Co., 4 Cir., 1951, 192 F. 2d 270, cert. den. 1952, 343 U.S. 914, 72 S.Ct. 647, 96 L.Ed. 1330; Bulldog Electric Products Co. v. General Electric Co., 4 Cir., 1939, 105 F.2d 466.

■ In this case, commercial success, if found, would not impart validity.

1. The court, for the reasons above set forth, is unqualifiedly of the opinion that invention is lacking.

2. The receipt of about one million dollars in royalties is a substantial sum, but is attributable in part to the questionable licensing practices of plaintiffs. Moreover, in view of the fact that plaintiffs have set aside a half-million dollars for patent litigation [234], the acceptance of a license rather than fighting is understandable. R.C.A., one of the most significant licensees in the electronics field, has not renewed its license.

3. The desire to avoid patent litigation, even on the part of an independent inventor, is clearly shown in the case of Photocircuits, Inc., of which Swiggett is the chief officer. At a wedding dinner a salesman showed him a piece of copper clad laminate and told him "all you fellows, with your knowledge, have to do is print and etch", and Swiggett, with his familiarity with the graphic arts while employed by Eastman Kodak, and photoprinting and photoengraving with the predecessor of Photocircuits, Inc., had the know-how to, and did, begin the production of printed circuits, without instructions or advice from anyone.[235]

4. The court finds as a fact that the progress of printed circuitry is attributable to the development of satisfactorily bonded metallized laminate rather than to any gain in knowledge of printing and etching metals. Defendant's expert on the difficulties of securing a satisfactory bond between metal and insulator testified without contradiction that in February 1945 there was no satisfactorily bonded metal clad laminate commercially available [236]; that the first major breakthrough did not occur until some time in 1951 [237]; that even after that date, bonds were not uniform [238]; and that the witness was aware of the '960 patent in 1952

233. So titled in PX–184.

234. Transcript, pages 1312–1315.

235. Transcript, page 1643.

236. Transcript, pages 2308–2310.

237. Transcript, page 2321.

238. Transcript, pages 2323–2337.

or 1953, but the disclosures and teachings were of no help in solving the problems relating to the production of copper clad laminate.[239]

The problem of bonding was critical not so much with respect to the original printing and etching (although a poor bond might result in etchant failures) as it was to the problem of mass production, and the use of dip or flow soldering, rather than manual or point soldering. Until the assembly-line dip or flow process could be used, the savings would not justify a change in technique. Indeed, until about 1956 British Technograph had problems of adhesion even with manual soldering.[240] It was at about this time that British Technograph moved to larger quarters.[241]

As will be discussed under "Infringement", many were working at about the same time as Eisler on printing and etching techniques. None succeeded commercially until a satisfactory bonding of metal to insulation was obtained; thereafter, many succeeded.

### Infringement.

A discussion of the claims of infringement is unusually difficult in this case. Ordinarily, no matter how certain the court may be in a determination of invalidity, the claims are understood, and, assuming their validity, a reasonably satisfactory decision can be reached as to their infringement vel non. Here, however, in addition to invalidity from lack of novelty (invention) the court has indicated the indefiniteness and uncertainty as to many of the terms used; e. g., foil, printing, component, junction points and metallic joints, inoperativeness. Were [242] the Court of Appeals to disagree with this court on any of the aspects which to this court appear to be indefinite and uncertain, the appellate court's interpretation presumably will

make "crystal clear" the true meaning of those terms. At this stage, this court can only recite the process steps followed by the defendant and correlate them to the patent claims.

### '960, claims 1 and 2.

Defendant correctly contends that it does not literally infringe, since '960 calls for "superposing a plurality of thus treated composite sheets with the imprinted foil surface thereof disposed in cooperating relationship, spaced from one another by the insulating backing thereof", while defendant does not fold or superpose (or superimpose) any printed circuit board, but starts with a piece of insulation bonded to both surfaces, i. e., it omits the "stacking" step.

The court would strongly be inclined to treat the two as equivalents, since after superposing, the two touching insulation backs could be bonded by adhesives or by heating, but is constrained to find either an absence of equivalence, or estoppel with respect thereto.

(a) The claims are *method* claims, not *product* claims. Therefore it is not sufficient that the final products function in the same way; they must have been made by the same method steps.

(b) A "plurality" normally refers to "the state of being numerous"; "a large number or quantity" [243]. While it may perhaps mean two, it embraces any number in excess of two. Defendant's method is at the most the equivalent of only two "composite sheets"; plaintiffs contemplate a method that will permit the use of more than two sheets.

(c) In Office Action of February 11, 1947, pending claim 10 which after amendment issued as claim 1 of '960, was rejected on Arlt in view of Norris and Baynes.[244] Arlt shows a double-sided board with a single layer of insula-

---

239. Transcript, page 2340.

240. Short deposition, pages 145–147. Short was Chief Development Engineer of the British plaintiff.

241. Hill deposition, page 94.

242. The court hopes this will be a leading example of the "subjunctive contrary to fact."

243. Webster's Third New International Dictionary, Unabridged.

244. DX 488, page 98.

tion separating the two. In the amendment there was added "a plurality of thus treated composite sheets with the imprinted foil surfaces thereof disposed in cooperating relationship, spaced from one another by the insulation backing thereof" [245]; and the "plurality" aspect was emphasized in the accompanying "remarks." [246]

File wrapper estoppel applies. Power Curbers, Inc. v. E. D. Etnyre & Co., 4 Cir., 1962, 298 F.2d 484.

(d) The distinction between defendant's method and the methods of Claims 1 and 2 of '960, implicitly recognized in the amendment to claim 10 which became claim 1, is explicitly recognized in the '165 patent. Claims 12, 13 and 14 call for "two sheets of metal foil with *an* impervious insulating backing between them." [247]

There is no infringement of claims 1 and 2 of '960.[248]

### '165. Claims 1, 2, 6 and 7.

Plaintiffs claim that defendant infringes these claims in the making of automobile radios and Doppler radar gear.

Defendant denies infringement.

(a) The claims require the printing of "junction points." Defendant contends that "junction points" in this as well as all the patents can mean only points where different conductors, in different planes, cross and are connected through the insulation(s). Plaintiffs' expert admitted that the specifications give such instance as the only example, but because the word "only" was not used, did not feel that the single example given should be exclusive.[249]

If defendant is right in its construction of "junction points" no single-sided board, including the accused radio boards, is infringing.

(b) As to both the radio and Doppler boards, defendant contends that they are not infringing because they are not "components." The conflict in plaintiffs' positions on this question has been noted.

The accused devices do not incorporate any printed capacitances or inductances or resistors. The testimony of defendant's Manager of the Radio Division was that the tracks on the radio boards merely connected the various parts of the radio electrically; that they functioned only as current conductors; that the configuration (location) was mechanical only; that the radio would function the same electrically if insulated wires replaced the printed tracks; and that the tracks served no function in addition to simple conductivity.[250]

The assistant to the general manager of the Computer Division also testified that the location of the external components and their relative position on the computer boards was of little significance electrically; the important theory was fitting them all in a given space, and appropriately connecting them with printed tracks, or wires.[251]

A somewhat dramatic demonstration that the tracks, as leads, performed only a conductive function, the same as insulated wires, occurred during the trial. The manager of the advanced development section of the Bendix Computer Division testified that boards used in the amplifier in the magnetic tape recording portion of the G–15's memory system had been designed and manufactured with

---

245. DX 488, page 101.

246. DX 488, pages 104–105.

247. Emphasis supplied. As these claims are not in suit, it is unnecessary to consider the possibility of the same file wrapper estoppel as to them.

248. On September 24, 1951 plaintiffs' then patent counsel, after considering the history of claim 1, wrote that he found "nothing to indicate that this claim, or

indeed any claim of the patent, is intended to apply to a single layer insulating backing having a printed circuit on each face thereof * * *." DX–538.

249. Transcript, page 854; and see Eisler deposition, page 249.

250. Randolph, Transcript, pages 2205–2212.

251. Sirvis, Transcript, pages 2498–2504.

printed and etched crisscrossed filament leads on opposite sides of the board, to simulate twisted wires. After measuring the response the cross-hatched portion of printed and etched leads was replaced with parallel straight wires with no difference in performance.[252]

The court finds by a preponderance of the evidence that the function of the printed tracks on the accused devices is one only of the conduction of current; and that the tracks serve no other or additional function. If they are not "components", there is no infringement;[253] if they are components, they are old in the art.

'697. Claims 4, 5, 10, 14, 15 and 16.

Claims 4, 10 and 14–16 are addressed to the negative imprint process, of which the Doppler Radar Board is an example of an accused product.

Defendant contends that it does not make any boards by the metal resist process, but that the process is completely performed by those who do make them, before they get to Bendix. Specifications for such boards were introduced into evidence[254] which describe the product desired, but do not specify the method or methods to be used in their production, and defendant's Manager of the Aironics Division and in charge of the accused boards, when called as a witness by plaintiffs, testified that he did not know of any experimental boards made by defendant, and that suppliers were not required to conform to any specific process in making circuit patterns.[255]

Plaintiffs obliquely infer that Bendix is a contributory infringer under 35 U.S.C. § 271(b). But in the absence of direct infringement there can be no contributory infringement. Aro Mfg. Co. v. Convertible Top Replacement Co., 1961, 365 U.S. 336, 81 S.Ct. 599, 5 L.Ed.2d 592. Plaintiffs have failed to prove that the only process by which the boards could be made would be an infringing one, and have failed to prove the process by which they are in fact made.[256]

There is no adequate proof of infringement of Claims 4, 10 and 14–16.

Claim 5, the "transfer" claim, is alleged to be infringed by the Friez Division commutators.

Plaintiffs claim that the methods employed by defendant fall within the teachings that "the metal foil must subsequently be removed, at least over those areas covered by the ink and therefore not covered by added metal, and this may readily be done after transfer in an acid bath which attacks the metal of the foil but not the added metal."[257] But this refers to an operation in which the "foil" is "on a suitable backing";[258] "an insulating backing"[259] which necessarily must be a temporary one, if there is to be a transfer.

In the accused process the foil is not supported upon a temporary backing, and hence the foil is never transferred from a backing to an insulating support. Defendant transfers the imprint formed by the deposited metal from *its* temporary support on the foil to the insulating backing which forms the permanent support for the imprint. Defendant follows the disclosure, not incorporated in claim 5, that:

"* * * A negative of this pattern may be printed in insulating ink on metal foil, and another metal may be deposited electrolytically on the bare lines of the foil. The imprint is then transferred to a perma-

---

252. Magnuson, Transcript, pages 3626–3627; DX 482; 482–A; 528 and 528–A.

253. This is another illustration of the temptation to a patentee to urge a narrow construction for purposes of validity, and a broad construction for purposes of infringement.

254. PX–419.

255. Rice, Transcript, pages 1274, 1282–1283.

256. Defendant also argues that these boards, containing merely conductive tracks, are not "components."

257. '697, column 5, lines 36–41.

258. '697, column 5, line 27.

259. '697, column 5, line 35.

nent support of glass * * *. The foil which formed the temporary base is then removed." [260]

Claim 5 is not infringed.

### Claims of Wilful Infringement and Concealment.

■ Plaintiffs claim that defendant wilfully infringed plaintiffs' patents, attempted to conceal the infringement, and accordingly is liable for treble damages, 35 U.S.C. § 284, and attorney's fees, 35 U.S.C. § 285. The court finds as a fact and concludes as a matter of law that plaintiffs have not met their burden of proof (Artmoore Co. v. Dayless Mfg. Co., Inc., 7 Cir., 1953, 208 F.2d 1, cert. den. 1954, 347 U.S. 920, 74 S.Ct. 518, 98 L.Ed. 1075; Enterprise Mfg. Co. v. Shakespeare Co., 6 Cir., 1944, 141 F.2d 916) with respect to these claims; but on the contrary, infringement if any, by defendant was in good faith, and there was no intentional concealment.

In reaching these conclusions the court has considered the record in the case with respect to the development of printed circuit techniques, defendant's files with respect thereto and with respect to the opinions of validity; and has taken account of the demeanor of the witnesses.

(1) Development of printed circuit techniques.

Initially it should be noted that '960 issued on May 25, 1948, and its specification should have taught all that was necessary for the practice of the claims in suit, otherwise the patents would be invalid as based upon incomplete disclosures.

Evidence was offered [261] that in late 1944—early 1945 the Friez Division laboratory produced electrically satisfactory printed radiosonde commutators. Thereafter manufacturers were consulted, and commutators produced by one Pritikin were supplied and experimentally tested in 1949 and adopted for commercial production in 1953.[262] There is some, but rather scant, documentary evidence in support of defendant's experimental work;[263] and more extensive record of the Pritikin work, including purchase orders and vouchers.[264]

Tuttle of Kenyon Instrument Company had also been consulted by Friez. Pursuant to a Signal Corps contract, Tuttle submitted a report dated September 15, 1947 [265] which disclosed the concept of producing printed circuits by printing and etching foil clad laminate, although bond problems made the product totally unsatisfactory commercially.

Beck's, Inc. in 1948 was also producing printed circuits on a commercial scale by the printing and etch techniques.[266]

In July 1949, a predecessor of plaintiffs sent the Signal Corps a general outline [267] of Eisler techniques, without any specific process being disclosed. The head of the Signal Corps acknowledged this on September 27, 1949, stating that except for flexible circuitry, the other techniques mentioned paralleled those of the Signal Corps.[268]

The Radio Division [269] of defendant also, but later, by early 1951, began experiments looking toward a printed circuit auto radio.[270] On March 2, 1951,

260. '697, column 9, lines 37–41, 44–45.

261. Transcript, pages 1880–1887; 2042–2044, 3040–3048.

262. Defendant manufactures under license under Pritikin patent 2,692,190—PX–436.

263. DX 470.

264. DX 450, 392–406.

265. DX 410; and see Transcript, pages 2854–2865, where Danko of the Signal Corps recognized this disclosure.

266. Transcript, pages 2871–2896.

267. PX 60.

268. PX 60.

269. One of the surprises of the trial was the testimony on behalf of defendant that its various Divisions, at the times in question, were operated as autonomous, almost airtight entities, with little exchange of ideas, and no common clearing house.

Defendant explains this on the basis that these Divisions had been acquired over the years as independent organizations.

270. Transcript, page 2128.

sample printed circuit boards had been obtained.[271]

Plaintiffs place great stress upon alleged disclosures to defendant at a "Pine Room" conference at Towson, Maryland on August 15, 1951, at which Mr. Shortt, president of the American plaintiff, gave a lecture. With regard to what was said and exhibited at the conference there is substantial disparity in the testimony. According to Mr. Shortt he completely disclosed the process steps by which various items were made, and he passed around a sample book which displayed the various steps of each process disclosed in the Eisler specifications.[272]

Some of defendant's witnesses recalled that samples of flexible circuitry and some induction coils were exhibited. None recalled any sample book; or disclosure or discussion of process steps, or illustrations of the various steps in printing and etching; and all but one testified to knowledge of the photoetch or print and etch techniques before the conference.[273]

Of course the failure to recall is negative in character; but the court would doubt the inability of any one of eight witnesses to recall any of what, if it occurred, should have been strikingly, even startlingly, impressive, if it were new. The court believes these witnesses were telling the truth. It also is remarkable that if the alleged disclosures were made, it would take Bendix until late 1954 to produce 3,000 radios with printed circuits for field trial.

The court also believes that Mr. Shortt was testifying truthfully as to his recollection of the time of trial.[274] With his great interest in using know-how as a licensing point, it is improbable that he would have made the sweeping disclosures claimed by him. It is also doubtful if in view of his very recent association with the Eisler interests he would have had time to assemble all the individual items he claimed were in the book.

On the whole record, and considering the demeanor of the witnesses on the stand, the court finds that plaintiffs did not, at the Pine Room conference or elsewhere or otherwise (except perhaps in the disclosures of the '960 patent) make available any information not known to defendant.[275]

(2) Concealment; Defendant's opinion of validity.

The correspondence reveals considerable sparring on both sides. Plaintiffs did not want to reveal what they had, until defendant was licensed. Defendant did not want to take a license until it knew what it was getting.

Further, the question of infringement, and necessity for a license, was dependent upon the correct interpretation of the very terms which have caused so much travail herein; component; printing; junction points.

As early as September 15, 1953, one of defendant's Patent Counsel advised his executives that the processes being used by the three divisions of defendant were "old in the decorative and graphic arts wherein a copper foil laminate on a plastic base is etched by ferric chloride through a resist prepared by a photographic process * * *"; that the

271. PX 443.

272. Transcript, pages 1057–1064, 1069–1071, 1080–1084, 1095–1117, 1130–1160; PX 391–398.

273. Clevenger, Transcript, pages 2633–2637; Williams, Transcript, pages 2644–2648; Merriam, pages 2655–2673; Baker, pages 2695–2703; Chapman, pages 2707–2717; Newbury, pages 2723–2738; Laning, pages 2741–2748; Crosby, pages 2758–2786.

274. Although Mr. Shortt was somewhat embarrassed at the trial by his previous

definition of "component" as two simple tracks connecting a battery and a bulb, in his correspondence with potential licensees and possible infringers, he made a very favorable impression as a witness.

275. Plaintiffs emphasize the characterization in the Bendix Engineering Reporter of the Pine Room conference as having "created a resurgence of interest in these techniques." Resurgence is not applicable to that which did not theretofore exist.

only patent that might be troublesome was '960, relating to "making circuit crossovers by interconnecting two prints through the supporting insulative sheet"; and that in view of cited patents he believed that "Eisler's claims of interest to us are invalid for lack of invention." [276]

On September 17, 1954, another patent counsel reviewed the '960 and '568 patents. The claims of '568 he found to be vague and ambiguous. As to both patents, he found all the steps to have been disclosed in the prior art. Although thinking that the Patent Office should not have allowed the claims over the art of record, with the true caution of an attorney (and particularly a patent attorney) he referred to the "hesitance of courts in holding claims invalid on art that was considered by the Patent Office", but referred to some prior art not cited against the patents. [277] In a letter of October 27, 1954, he concluded with the opinion that any claims that might be infringed "are altogether too broad and would not be held valid by a court." [278]

Another house patent attorney, in a letter dated December 10, 1954, upon which plaintiffs place great reliance stated that he had been "unable to locate any art which would tend to invalidate the claims of the Eisler patents under consideration." He refers to the patents previously listed by other counsel, adds four others which "further negative the Eisler invention"; and points out that unless the exact language used by Eisler can be found in the prior art, "there will always be the question of validity because the prior art on this subject is very close and very highly developed * *." [279]

The court regards this as simply the conservative approach that there is al-

ways some question of validity where no direct anticipation has been found. The same conclusion is true as to the report of the meeting of the Bendix Patent Committee of December 13, 1954. [280] This was reiterated in a report of December 30, 1954, [281] and again on October 18, 1955. [282]

The last of the memoranda, of December 5, 1955 [283] has been seized upon by plaintiffs as showing wilfulness. Several times they give the partial quotation that the author of the memorandum advocates that " * * * regardless of the patent's merits, I feel that we should do more fighting and less giving in to such threats." [284]

The intended implication would seem to be that no matter how strong plaintiffs' patents might be, fighting was the better tactic. In giving only this partial quotation, the court feels plaintiff's attorneys have pushed advocacy to at least the limit, since the full text is:

"To sum up my opinion, speaking only for Radio and York, is that the Technograph patents, on their merits, do not justify a license.

"As to the desirability of taking a license to avoid a suit, regardless of the patent's merits, I feel that we should do more fighting and less giving in to such threats." [285]

This to the court is the "millions for defense but not one cent for tribute" approach, rather than that implied by plaintiffs.

The court finds as a fact, and concludes as a matter of law, that if defendant infringed, the infringement was not wilful, but was in good faith, and with a reasonable doubt as to the validity of plaintiffs' patents; that there was no deliberate concealment; and that plain-

---

276. PX 380.

277. PX 380.

278. PX 380.

279. PX 380.

280. PX 380.

281. PX 380.

282. PX 380.

283. PX 380.

284. E.g., Plaintiffs' Brief on Infringement, page 73.

285. PX 380.

tiffs are not entitled to treble damages or attorneys' fees.

### Summary.

 Claims 1 and 2 of Patent 2,441,-960; claims 1, 2, 6 and 7 of Reissue Patent 24,165, and claims 4, 5, 10, 14, 15 and 16 of Patent 2,706,697 are invalid.

Assuming the claims in question to be valid, defendant has not infringed claims 1 and 2 of Patent 2,441,960 or Claims 4, 5, 10, 14, 15 and 16 of Patent 2,706,697. Under the court's construction of the ambiguous language therein, Claims 1, 2, 6 and 7 of Reissue Patent 24,165 have not been infringed.

If any of the claims in question have been infringed by defendant, such infringement was not of a character to permit the imposition of treble damages or the allowance of attorneys' fees.

Defendant's counterclaims for declaration of invalidity and non-infringement of the claims not above mentioned are denied without prejudice.

The foregoing opinion embodies the court's findings of fact and conclusions of law, under F.R.Civ.P. 52(a), 28 U.S.C.

The parties may submit an appropriate judgment or requests for judgment within ten days; otherwise the Clerk is directed to enter judgment at the expiration of said ten-day period in accordance with the foregoing Summary.

### APPENDIX

1. Patent 2,441,960 to Paul Eisler—May 25, 1948. "Manufacture of Electric Circuit Components"

 Application February 3, 1944, Serial No. 520,991 In Great Britain February 2, 1943

"This invention relates to the manufacture of electrical apparatus, and particularly to the production of electric and magnetic circuits and parts thereof.

"A principal purpose of the invention is to facilitate and cheapen quantity production of electric circuit components, such as the resistances, inductances, transformers, tubes, and interconnecting networks or circuit connections of radio apparatus, the cores and windings of iron-cored transformers and dynamo electric machines, the connecting networks of switchboards, the conductors of heating appliances, and generally of any electrical circuit component which it may be convenient to manufacture by the methods herein disclosed.

"A further purpose of the invention is to facilitate the production of electrical circuit components, even though they be not needed in great quantities, in which a high degree of precision is required in the dimensioning or relative location of conductors such as cannot readily be obtained by known means.

"Yet another object of the invention is the production of surface heating elements in which the conductor also constitutes or carries an ornamentation.

"Other objects of the invention will appear from the description following.

"Most electrical circuit components essentially comprise metal parts, conducting electric current of magnetic flux, supported upon an insulating base, or with interposed insulation upon a metal base.

"The invention consists in the production of the metal electric and magnetic conductors in position upon their insulating support by a process based on the printing of a representation of the conductive metal.

"The common way of building up an electrical circuit or circuit element is first to draw metal into wire, that is to say make a linear conductor, and afterwards to shape this conductor into coils and networks. By the application of the methods of the printing art the invention brings the metal conductor of the circuit component into existence in its final form, or in a development of that form upon a plane or cylindrical surface.

"A typical instance of the invention comprises the steps of preparing by any of the well-known methods of the printing art, a printing plate for printing a representation of the metal electric or magnetic conductors of the circuit com-

ponent or a part of them; making an imprint by the aid of the printing plate upon a surface thereby differentiating on that surface the areas which are required to be conductive from the areas which are required to be non-conductive; and from that imprint producing the conductor by subjecting the printed surface to treatment which operates differently on the areas of the surface differentiated by the printing, thereby changing the differentiation into a differentiation of conductive and non-conductive areas.

"The development of the conductor from the imprint is in most cases effected by methods adapted from the printing art or analogous to the methods of the printing art, such as etching, bronzing, electro-deposition and the like.

"Where on account of the process of development adopted, or on account of the nature of the fabric which is to form the permanent base of the conductor, it is inconvenient to make the imprint on the permanent base, it may be made on a temporary base, which must be removable, and the development process be followed by a transfer process akin to those known in the printing art. * * " (Column 1, line 1—Column 2, line 24.)

"The diagram of connections or hook-up shown in Figure 1 forms no part of the invention, is substantially known, and therefore will not be described further than is necessary to assist the understanding of the later figures. It is seen to consist of valves $V_1$, $V_2$ etc., resistances P, R1, R2, etc.; inductances such as L', capacitances C1, C2, etc., an output transformer LS, and a network of conductors by which these other components are connected together. It is the production of the connecting network that will first be studied.

"The radio engineer charged with the manufacture of a radio receiver according to Figure 1, must first plan the lay out of the several components, including the connecting network, and produce a lay-out and wiring plan such as is shown in Figure 2. The design of this lay-out is again a matter for the radio engineer with which the present invention is not primarily concerned; though the radio engineer familiar with the present invention will naturally in planning his lay-out have regard to the fact that such and such components of it are to be made by the methods of the present invention. The correspondence between Figures 1 and 2 is sufficiently apparent from the references upon the several parts already mentioned.

"It will be noted that the circuit connections shown in Figure 2 involve several instances of crossing conductors; for instance the connection from L.S. to V3 crosses the connection from R3 to V3. In wiring with pre-formed wires such connections are kept separate by suitable disposition in three dimensions; Figure 2 is not intended to represent such disposition; indeed some conductors are displaced to one side merely for the sake of clearness.

"For the application of the invention to the manufacture of such a network it is manifestly convenient for the connections to be disposed in one plane; but if they cannot be so disposed without crossings it will be convenient to dispose them in two or three or more planes; so making the network two or more circuit components which are printed separately or side by side and afterwards assembled in superposition or other desired relation and connected together where necessary.

"In the present instance the whole of the circuit connections can conveniently be set out in two planes, and they are shown so set out in Figures 3 and 4. The general resemblance of Figures 3 and 4 to the lay-out plan of Figure 2 can be seen at a glance, and the location of various components other than the network itself can readily be recognized. For example, V1, V2, V3 and V4 in Figures 3 and 4 mark the location in the network of the tubes or valves indicated by those references in Figures 1 and 2. It will be seen that if Figure 4 be directly superposed on Figure 2 the valves, or rather valve holders, indicated in the latter figure come in the places to which

valve connections converge in Figure 4. Figure 3 will similarly register with Figure 2 and with Figure 4 if turned face downward. If the correspondence of these figures be studied in detail it will be seen that some conductors shown in Figure 2 appear in part in Figure 3 and in part in Figure 4; for example the connection between V2, C9 and R7 in Figure 2 is represented by the connection a, b from the position of V2 in Figure 4, the connection b, c in Figure 3, and the connection c, d in Figure 4. Provision has to be made for joining these connections into one conductor in the finished articles; for this reason the parts of it are drawn so that their ends overlap when Figures 3 and 4 are superposed back to back; thus the points b and c of Figure 4 overlap and register with the points b and c of Figure 3.

"To make possible the employment of universal tools, as hereinafter described, in the manufacture of various schemes of connections, of which Figures 1 and 2 are only one example, it is convenient to limit the possible positions of junction points such as b and c. For this reason it is of advantage to prepare the drawings of the part schemes, Figures 3 and 4, by the aid of squared tracing paper and to arrange that every junction point falls upon an intersection of the lines of the grid. It would only confuse Figures 3 and 4 to superpose such a grid upon them; two lines of the grid are indicated by the chain lines 21 passing through the point c in both Figures 3 and 4.

"From the drawings, Figures 3 and 4, printing plates are prepared by any of the usual methods of the printing art. These printing plates may, for example, be engravings on metal, or lithographic stones, or they may be prepared by any usual photomechanical process, or they may be photographic plates. The printing plates so produced may be in relief, in intaglio, or planographic, according to the method of production.

"From the two printing plates so produced any desired number of identical prints of the circuit component may be made.

"In one form of the invention, convenient for the instance under consideration, the prints are made upon a composite material consisting of metal foil upon an insulating backing. The thickness and nature of the foil and of the backing depend upon the particular process chosen for converting the imprint of the circuit component into a circuit component. Metallised or metal-coated paper is one material; it is preferable to impregnate the paper with an acid-resisting varnish made of a suitable plastic. Or metal foil may be coated with varnish or with a layer of plastic of the desired thickness. Or a metal coating may be applied to a pre-formed sheet of insulating material, such as a plastic. Zinc, aluminium, and copper may be named among suitable metals.

"For the purpose of the particular example of the invention now under consideration the print is made with an acid-resistant ink upon the metal side of such composite material. Except where the pattern to be printed is very fine it is an advantage to impart a grain to the metal surface by use of an etching bath, or by abrasion or otherwise, prior to printing. The print may be made directly from the printing plate or by the off-set method. To ensure a print free from pin-holes, the print may be overprinted, or otherwise reinforced. The print is naturally identical with Figures 3 and 4, and those figures equally represent the drawing from which the printing plate was prepared, and the print made from the plate upon the metal surface of a composite sheet.

"The part circuit components are next perforated at all the points at which junction has to be made between the conductors of the sheet corresponding with Figure 3 and those on the sheet corresponding with Figure 4, that is to say at all points such as c. The restricted location of such junction points as above described enables all the perforations, whether for these particular components or for any other circuit components of

like area, to be made by a universal punching tool in which pin punches can be inserted at any of a large number of positions corresponding with the intersections of the grid employed in preparing Figures 3 and 4. If there are large areas of metal to be removed they may be punched out prior to etching, for instance simultaneously with the perforation, so as to even up the extent of etching necessary all over the print.

"The sheet is then etched in the well-known manner of the printing art, in a bath suited to the particular metal employed, but with this difference from the usual etching of a printing process that the metal not protected by the resistant ink is wholly etched away. To permit of this complete etching away without undue undercutting of the protected parts it may be convenient, as is commonly done in preparing printing plates, to interrupt the etching and re-coat the surface, for instance with a fatty ground, which can be made to protect the sides of the etched lines as well as the outer surface. When etching is complete the ink may be washed off.

"It will be clear that Figures 3 and 4 equally represent the etched print, that is to say they may be regarded as depicting a sheet of insulating material coated with metal over the shaded parts only.

"The two part circuit components are now superposed back to back and metallic junctions are made between them at all the perforations. Such connections may be made in the manner now common in the radio art by means of eyelets. Figure 5, for example, shows a cross-section of a small portion of an insulating sheet 22, having conductors 23 on each side of it produced by printing methods such as that above described or those described hereinafter, and the conductors on one side are joined to conductors on the other side, and to the terminal tags of other circuit components such as the resistance 24, by eyelets or hollow rivets 25. Or such connections may be made by wire stitching, using wire staples, or wires bent twice at right angles into 8 form as seen at 26 in Figure 6, and the ter-

minal wires 27 of a component such as the fixed capacitance 28 of Figure 6 may be used for such stitching. The eyelets or wires are preferably tinned and solder-painted, so that the joints may subsequently be perfected by soldering. This operation also may be performed by a heated universal tool in which soldering bits are set at the position of the junctions of the circuit component in course of manufacture. If desired the metal may be protected and insulated by a coating of varnish except over points required to be accessible for purposes of testing or the making of further connections.

"The circuit may be tested by a universal testing appliance which permits of contacts being set in desired positions on a surface.

"If desired a single printing plate may reproduce the two representations, Figures 3 and 4, side by side, on the same composite sheet. In that case the conductors developed from the print are superposed by folding the sheet back upon itself with the conductors outward.

"It will be seen that the essence of the particular method of producing circuit components just described is the preparation of a printing plate, the printing from it of a representation of the conductors of the circuit component, thereby differentiating on the printed surface the areas which are required to be conductive from those which are required to be non-conductive, and the subjecting of the surface to an after treatment which operates differently on the differentiated parts and converts the differentiation into a differentiation of conductive and non-conductive areas. The imprint made is a positive imprint, that is to say the inked part represents the conductors of the component; and the imprint is made on metal; and the component is completed by removal of metal from the unprinted areas. It will be seen below that it is not essential that the imprint be positive, nor that the imprint be made on metal, nor that the component be developed by removal of metal.

"In the particular method just described removal of metal was effected by chemical etching; it could equally well be removed by electrolysis, the print being made on metal foil upon a conductive backing, say of another metal, and the printed surface being made the anode in a bath of electrolyte which attacks the foil. This method is appropriate when it is to be followed by transfer of the conductor to a permanent insulating base, after which the conductive backing is dissolved or otherwise removed. In the case of some metal foils, for example aluminium, it may be convenient instead of removing them wholly, to convert them into non-conductors, a process well-known as 'anodising,' and which also consists essentially in making the metal an anode in a suitable electrolytic bath.

"Instead of producing the circuit component from the imprint by removal of metal it may be produced by adding metal. For example, the printing plate may be prepared to print a negative of the circuit component, that is to say to cover with ink those parts of the surface which are to be non-conductive. A negative imprint can be made in insulating ink upon metal foil, say zinc foil, on a suitable backing, and additional metal of a different kind, say copper, can be added to the parts not inked by electro-deposition, the printed foil being made the cathode in an electrolytic bath. Or the printed foil may be subjected to a galvanising process by coating it with flux and passing it through a bath of molten metal, which must naturally be a metal of low melting point such as Rose metal or a soldering alloy, melting at a temperature which will not harm the insulating backing. These methods, also, appropriately precede transfer, for the metal foil must subsequently be removed, at least over those areas covered by the ink and therefore not covered by added metal, and this may readily be done after transfer in an acid bath which attacks the metal of the foil but not the added metal.

"Other modifications of the method of producing a circuit component by adding metal to the printed surface do not require the print to be made on metal. A positive imprint of the circuit component may be made in sticky ink upon an insulating ground, and the imprint may be metallised in various ways of which the following are examples. Metal leaf may be applied to the printed ground, and so much of it as does not adhere may be removed by dabbing. Or metal powder may be dusted on in the manner usual in the 'bronzing' process of the printing art; it will adhere to the imprint and elsewhere may be removed; the adherent powder is not however conductively continuous and must be made so by subsequent consolidation. One method of consolidating a discontinuous powder imprint is to spray metal on the printed and bronzed ground by tools familiar in the art of painting for protection; in the typical case the metal is melted and broken into a fine spray by air under pressure which propels it through a spraying nozzle. The metal spray is molten or at least soft when it impinges on the metal dust of the print, and joins its particles metallically. Alternatively the metal dusted on may include a component of low melting point, such as Rose metal, or a solder, and a flux, as well as a component of less readily fusible metal. These may be mixed as powders or be applied in succession, provided they are intimately mixed in the print. By subsequent heating the low melting point metal is caused to unite the less readily fusible particles. It is not satisfactory to use a low melting point metal alone as it tends to fuse into discrete globules.

"Another method of consolidation is to subject the bronzed print to a hot galvanising bath. A third method is to heat the bronzed imprint in the vapour of a metal compound which readily dissolves; for example iron may be thus deposited on the imprint by heating it in the vapour of iron penta-carbonyl; the heating may be effected by a high frequency magnetic field.

"If the process of consolidation to be employed involves heating to a temperature at which the ink imprint might

soften, something must be done to fix the bronzed imprint in position before consolidation. One means of fixing is to include in the composition of the ink a thermosettng [sic] plastc, [sic] which is polymerised and set by heating before the process of consolidation; heating may be effected by a high frequency electro-static field, or by infra-red radiation.

"The invention also includes the converse of each of these methods, which consists in preparing a printing plate to print a negative of the circuit component, and making the imprint in ink to which metal will not adhere upon an insulating surface to which it will adhere, and thereafter applying leaf metal or dusting on metal powder and consolidating as above described.

"The necessary intimate association of the two metals to be dusted on is better ensured by coating the metal powder of high melting point with a metal of lower melting point, which may be effected in an electrolytic bath, or, particularly in the case of alloys such as Rose metal, by stirring the powder of high melting point metal into suspension in the molten low melting point alloy, and grinding to powder the solidified product. The flux may also be a coating on one of the mixed powders or on the metal-coated metal particles made as just described. If the particles are not also coated with flux there may be included in the ink of which the imprint is made ingredients such as rosin oils to serve as flux.

"If desired the less readily fusible constituent metal required to produce a consolidated imprint, or both metals, may form the pigment of the printing ink. In the former case the metal particles in the ink may be coated with flux and the second metal ingredient may be added in any of the ways above described, by hot soldering, by spraying, or by deposition from vapour. In the latter case the pigment may consist of particles of less readily fusible metal coated with fusible metal and if desired with flux also, and consolidation will be effected by simple heating of the print, say by a high frequency magnetic field.

"The printing plate may be a photographic plate of film, in which case the imprint is made by contact printing or projection upon a sensitised surface. For example a metal plate may be gelatine coated as in zincography, and printed from a negative of the circuit component. The coating is hardened where it is exposed to light and elsewhere may be washed away, and the metal so uncovered can be etched away, preferably in stages. Or the hardened gelatine may be inked, and dusted with metal which is consolidated as above described. The imprint may be transferred to a permanent base prior to consolidation, and this necessary if the gelatine could not withstand the consolidation process chosen.

"Any of the processes above described may include or be followed by the step of transferring the imprint from a temporary to a permanent base, provided due regard be paid to the requirements of that step in the selection of materials.

"These various methods by which an imprint of a circuit component is converted into a circuit component are to be regarded as illustrative examples only; to those acquainted with the printing art, from which most of the individual steps employed are taken, with some modification, it will be obvious that many other modified operations or modified sequences of operations may be adopted according to the nature of the circuit component that is to be made. A few of these are mentioned below in connection with the making of particular circuit components. * * *" (Column 3, line 27—Column 8, line 57.)

"If greater inductance is required than can conveniently be obtained in a single spiral—for example if a winding of a great number of turns is required with or without an iron core—the spiral pattern may be repeated as often as desired. A convenient pattern is that shown in Figure 7, which consists of pairs of spirals 31, 32, joined at their outer ends. The free ends of the spirals from junction points 34, and it will be noted that some of these, but not all, have the same angular position as each other;

64

for example no two of the spirals in the second row have their free ends in the same position, but each of them has its free end in the same position as has the spiral beneath it in the third row. This pattern may be printed on metal on an impregnated paper backing which can readily be folded. After the print has been metallised in one of the ways above described and its surface coated (or left coated) with insulation, except at the junction points, the sheet is folded about the line 35–35. The junction points become superposed in register and may be connected by spot-welding by a universal welding tool analogous to the soldering tool above mentioned. Or they may be joined as explained with reference to Figures 5 and 6. After the junctions have been made the print is further folded about the lines 36–36, the line 37, 37 and the lines 38–38. By a small modification in the pattern, junction points may be made to abut upon one another on folding, as shown in Figure 8, which is a cross section of several spirals 41 on insulating sheets 42, the inner or outer end of each spiral being folded to abut on the inner or outer end of its neighbour; the spirals are held together by the bolt 43 which exerts sufficient pressure to make a metallic connection at the points of abutment. If an iron core is to be used the centres of the spirals of Figure 7 are punched out along the dotted lines 39 before folding, and the insulation between spirals may also be punched out as indicated by the dotted circles surrounding the spirals. * * *" (Column 9, lines 16–59.)

"The invention is by no means confined to the building of circuit components for radio receivers. The pattern of parallel lines described with reference to Figure 9 is a typical pattern for the production of electrical resistances, for example for all kinds of heaters. The pattern of parallel resistant conductors may be wanted upon some article or fabric to be heated on which it is not convenient to print. In that case the resistant pattern is produced by printing upon a temporary ground, for instance printing upon foil of resistant metal upon a backing of waxy paper, and is transferred to its permanent backing by a subsequent operation. The method of printing and etching and subsequent transfer, for example, might well be used to produce a resistant conductor upon cement or plaster of Paris.

"A resistant conductor such as indicated in Figure 9 may be formed upon wall-papers, wall and furniture panels, curtains, and other hangings, upholstery fabrics, floor coverings, clothing and bedclothing, and the like for the purpose of making electric heaters or rather warmers of them. Such a conductor, though of small thickness, will carry a substantial current because its flat form promotes loss of heat by radiation and conduction. The conductor will be insulated and protected by a covering, for instance of a varnish or plastic on which powdered metal oxide may be dusted to increase radiation; in the case of aluminium the conductor is preferably covered by oxidation for the same reasons.

"When used on ordinarily ornamental fabrics such as wallpapers the pattern of Figure 9 may be made to provide or contribute to the ornamentation by a double printing process. There is first produced a pattern of parallel lines of say, aluminium, copper, zinc, iron or nickel. Upon this any ornamental design 53 is printed in an insulating ink. The sheet is then made the cathode in an electrolytic bath by which copper is deposited on the metal lines except where covered by ink. The final product is, as before, a sheet with a pattern of parallel lines of which those parts within the design are of higher resistance than the remainder. Alternatively the overprinted sheet may be anodised to bring about reduction in the cross section of the unprotected parts. * * *" (Column 11, line 71, Column 12, line 46.)

"An example of an electrical circuit component in the production of which a process including the step of transfer is desirable, is the electrodes of a thermionic tube or valve. Figure 21 shows the pattern of the electrodes for a double triode, with the exception of the cathode. There are two grids 84 and two anodes

85. A negative of this pattern may be printed in insulating ink on metal foil, and another metal may be deposited electrolytically on the bare lines of the foil. The imprint is then transferred to a permanent support of glass, which initially is a plane cross 86 as shown in Figure 22 with apertures 87 in it in position corresponding to the position of the elements of the grids in Figure 21. The foil which formed the temporary base is then removed. The support 86 is heated and (the print being on the upper face) its four limbs are folded downward through a right angle about the lines 88; then they are folded outward about the lines 89, and upward about the lines 91. The assembly is mounted on a glass stem around the cathode and connections are made from the grids and anodes to wires sealed through the stem; and the whole is then sealed into a bulb which is evacuated in the usual manner." (Column 13, lines 37–62.)

### CLAIMS.

"1. A method of manufacturing a system of electric circuit connections involving crossing connections on a composite sheet formed of insulation backed metal foil, comprising preparing at least two drawings each of a part of the said circuit connections the conductors of which do not cross, said drawings together including all the circuit connections together with overlapping junctions which register when the drawings are superposed, preparing from each drawing a printing plate, printing from each plate upon separate foil surfaces, utilising the differentiation resulting from the imprint to produce a differentation [sic] of conductive and non-conductive parts upon the printed surfaces by separating out from the composite sheet the non imprinted portion of said foil surfaces, perforating the said imprints at points where connections are required between one imprint and another, superposing a plurality of thus treated composite sheets with the imprinted foil surfaces thereof disposed in cooperating relationship, spaced from one another by the insulation backing thereof and making metallic connections between the foil imprints through the insulation backing therefor at the points of perforation of the foil imprints.

"2. A method of manufacturing a system of electric circuit connections involving crossing connections on a composite sheet formed of insulation backed metal foil comprising preparing at least two drawings each of a part of the said circuit connections the conductors of which do not cross, said drawings together including all the circuit connections together with overlapping junctions which register when the drawings are superposed, preparing a printing plate from each drawing, printing from each plate with acid resist designs upon separate foil surfaces, utilizing the differentiation resulting from the imprint to produce a differentiation of conductive and non-ductive parts upon the printed foil surfaces by etching out from the composite sheet the non-imprinted portions of said foil surfaces, superimposing portions of the thus treated composite sheet with the imprinted foil surfaces thereof disposed in cooperating relationship and spaced from one another by the insulation backing thereof, and making electric connections between the foil imprints through the insulation backing therefor."

2. Patent 2,706,697 to Paul Eisler—April 19, 1955 "Manufacture of Electric Circuit Components"

Application February 27, 1948, Serial No. 11,798, now Patent No. 2,587,568, dated February 26, 1952, which is a division of application Serial No. 520,991, February 3, 1944, now Patent No. 2,441,-960, dated May 25, 1948. Divided and this application December 17, 1951, Serial No. 261,989

[The specification is substantially identical with that of Patent No. 2,441,960, supra, except for the omission of reference to "consolidation" of inks.]

### CLAIMS

"4. A method of manufacturing the conductive metal portions of electric and magnetic circuits of the kind including a

conductive pathway pattern upon an insulation backing comprising the steps of printing a negative representation of the desired pathway pattern upon the metal surface of a sheet of foil clad insulation, thereupon depositing dissimilar metal upon the unprinted surfaces of the foil, and finally removing the foil from the imprinted areas whereby an insulation backed metallic pathway pattern is formed.

"5. In a method of manufacturing the conductive metal portions of electric and magnetic circuits of the kind including a conductive pathway pattern upon an insulation backing, the steps of printing a negative representation of the desired pathway pattern upon a sheet of metal foil, thereupon depositing metal upon an unprinted surface portion of the foil, and then transferring the metal foil to an insulating support.

\* \* \* \* \* \*

"10. A method of manufacturing a component of electric and magnetic circuit systems involving an insulation backed conductive pathway pattern, which comprises providing insulation backed foil, then printing a negative representation of the pattern upon said foil, depositing a layer of metal dissimilar to the metal of said foil upon all exposed parts of said foil, then removing said representation from the foil, and finally removing all parts of the foil exposed by said removal of the representation by chemical action attacking the metal of said foil but not said deposited dissimilar metal whereby said pathway pattern is formed.

\* \* \* \* \* \*

"14. A method of manufacturing a component of electric and magnetic circuit systems involving an insulation backed conductive pathway pattern, which comprises providing insulation backed foil, then printing a negative representation of the pattern upon said foil with a resist medium, then depositing by electrodeposition a layer of a metal dissimilar to the metal of said foil upon all exposed parts of said foil, then removing the resist medium, and finally etching

away all parts of said foil exposed by the removal of the medium in a bath attacking the metal of said foil but not said dissimilar metal whereby said pathway pattern is formed.

"15. A method of manufacturing a component of electric and magnetic circuit systems involving a backed conductive pathway pattern which comprises providing on a backing a foil in form of a metallic layer, producing a negative representation of the pattern on said layer, then depositing a metal dissimilar to the metal in said layer upon all exposed parts of said layer, and finally removing by chemical action attacking the metal in said metallic layer but not said dissimilar metal all parts of the metallic layer other than those upon which said dissimilar metal is deposited whereby said desired pathway pattern is formed."

3. Patent Re. 24,165 to Paul Eisler— June 12, 1956 "Manufacture of Electric Circuit Components"

Original No. 2,587,568, dated February 26, 1952, Serial No. 11,798, February 27, 1948, which is a division of Serial No. 520,991, February 3, 1944. Application for reissue February 25, 1954, Serial No. 412,671. In Great Britain February 2, 1943

Section 1, Public Law 690, August 8, 1946

Patent expires February 2, 1963
[The specification is substantially identical with that of Patent No. 2,441,960, supra, except for the omission of references to transformers and thermionic valves or tubes; transfer processes; and "consolidation" of inks]

## CLAIMS

"1. A method of manufacturing a component of an electric circuit involving a conductive pattern of such weak mechanical structure that it is incapable of self-maintaining its configuration, said component including at least one conductor linking at least two terminals of said electric circuit of different operating potentials and including metallic joints for at least one other electric device not contained within said component, which comprises providing a

sheet of metal foil with an impervious insulating backing, printing a representation on the surface of the metal foil of the conductive pattern of the component, including junction points which register with said metallic joints, in a medium adherent to said foil and protecting it from chemical attack on the areas of said pattern, subjecting the metal foil to a chemical action utilizing the differentiation resulting from the imprint to produce a differentiation of conductive and nonconductive parts of the metal foil, and making electric connections at said junctions.

"2. A method of manufacturing a component of an electric circuit according to claim 1 wherein the printed metal foil is subjected to the chemical attack of an etching fluid and the metal not covered by the protective medium is completely dissolved.

\* \* \* \* \* \*

"6. A method of manufacturing a component of an electric circuit according to claim 1 including the additional steps of deposition of metal upon at least selected parts of the metallic foil of the component.

"7. A method of manufacturing a component of an electric circuit involving a conductive pattern of such weak mechanical structure that it is incapable of self-maintaining its configuration, said component including at least one conductor linking at least two terminals of said electric circuit of different operating potentials and including metallic joints for at least one other electric device not contained within said component, which comprises providing two sheets of metal foil with an impervious insulating backing between them, printing a representation on the exposed surface of one of the sheets of metal foil of a portion of the conductive pattern of the component, including junction points which register with said metallic joints, in a medium adherent to said foil, printing a representation of another portion of said conductive pattern on the exposed surface of the other sheet of metal foil in a similar medium and protecting said foil

from chemical attack on the printed areas of said pattern, subjecting the metal foil on the opposite sides of said backing to a chemical action utilizing the differentiation resulting from the imprints to produce a differentiation of conductive and non-conductive parts of the metal foil, and making electric connections at said junctions."